188 N.J. Super. 523 (1983)
457 A.2d 1232
IN THE MATTER OF CLAIRE C. CONROY.
Superior Court of New Jersey, Chancery Division Essex County.
Decided February 2, 1983.
*524 William I. Strasser for plaintiff Thomas C. Whittemore (Donohue, Donohue, Costenbader & Strasser, attorneys).
John J. De Laney, Jr. for patient Claire C. Conroy.
STANTON, J.S.C.
The question presented by this case is whether a nasogastric tube should be removed from an 84-year-old patient who is suffering from severe organic brain syndrome and a variety of serious ailments. The patient is totally dependent upon the tube for nutriment and fluids. Removal of the tube will probably result in death within a few days. I have decided that it would be wrong to prolong the life of the patient. Her guardian will be authorized to have the tube removed.
Claire Conroy was adjudicated incompetent in 1979. Her nephew, Thomas C. Whittemore, plaintiff in the present action, was appointed as her guardian. Since 1979 the patient has been a resident of Parklane Nursing Home in Bloomfield, New Jersey. In July 1982 the patient was admitted to Clara Maas Memorial Hospital, Belleville, because of a severe infection of her left foot. Her left foot was diagnosed as being gangrenous. Her physicians recommended amputation of her left leg above the knee. The physicians believed that death could occur within two weeks if the leg was not amputated. In the belief that the amputation was not in the best interests of his aunt, the guardian refused permission. The physicians declined to press the issue. The leg was not amputated, but the patient did not die. The patient was discharged from the hospital back to the nursing home on November 17, 1982. At present the lower left leg is wasted and rotted. However, the infection has been contained and the leg does not presently pose a threat to the patient's life. The leg does not now seem to be a source of major pain.
Claire Conroy suffers from severe organic brain syndrome, necrotic decubitus ulcers on her left foot, left leg and left hip, *525 urinary tract infection, arteriosclerotic heart disease, hypertension and diabetes mellitus. Except for minor movements of her head, neck, arms and hands, she is unable to move. She does not speak. She lies in bed in a fetal position. She sometimes follows people with her eyes, but often simply stares blankly ahead. Her general physical appearance is very withered. Although she moans when moved or touched upon some portions of her body, medical testimony is inconclusive as to whether she is capable of experiencing pain. The patient has sufficient brain functioning to regulate certain internal bodily functions. However, except for use of her hands for scratching, she seems incapable of useful external bodily activity. All the testimony in the case and my own direct observation of the patient convince me that she has no cognitive or volitional functioning. There is no reasonable expectation that the patient's condition will ever improve.
During her recent hospitalization a nasogastric tube was inserted through the patient's nose, down her throat and into her stomach. Several times a day water, a nutrient formula, vitamins and medicine are poured through the tube. The patient is unable to swallow. Nurses would not be able to feed her by hand. Without the tube the patient would probably die of starvation and dehydration within a few days. With the tube the patient will probably be able to live for some months, perhaps even a year or more.
Claire Conroy never married. Her siblings are all dead. Her only surviving relative is plaintiff, who is her nephew and guardian. Plaintiff testifies that his aunt never saw a physician or received medical treatment at any time prior to her becoming incompetent in 1979. She scorned medicine. Her nephew believes that she would not willingly accept the tube and the treatment she is now receiving. The guardian wishes to have the tube removed and to allow his aunt to die. The patient's treating physician, Dr. Ahmed Kazemi, will not consent to the removal of the tube. The nursing home has been following the physician's wishes. However, the home is essentially neutral on *526 the issue of removal of the tube and will not oppose any order entered by the court. The nephew/guardian has brought this action to obtain a judicial declaration that he has the right to have the tube removed.
The guardian filed a complaint on January 24. On January 26 I appointed John J. De Laney, Jr., an attorney, as guardian ad litem of Claire Conroy. I heard testimony on January 31 and February 1. This opinion is being issued on February 2. The witnesses have been Dr. Ahmed Kazemi, the treating physician, Dr. Bernard Davidoff, a physician called by the guardian ad litem, Catherine C. Rittel, a registered nurse who is the nursing home administrator, Thomas C. Whittemore, the nephew/guardian, and Rev. Joseph Kukura, a Roman Catholic priest who is a member of the medical ethics committee at four hospitals and an associate professor of Christian ethics at Immaculate Conception Seminary.
The physicians agree on the medical condition of the patient. So does the nurse. It is obvious to any person seeing the patient that she is desperately sick. It is also obvious that her mental functioning is primitive. Dr. Kazemi thinks it would be a violation of medical ethics to remove the tube. Dr. Davidoff believes that, with the consent of the patient's guardian, the tube should be removed. Nurse Rittel would be reluctant to see the tube removed. The guardian thinks it is wrong to keep his aunt alive through use of the tube. Father Kukura thinks that under all of the circumstances of this case removal of the tube is morally appropriate. The guardian ad litem argues strongly against removal.
I think it fair to say that everyone involved in this case wishes that this poor woman would die. This wish does not flow from any lack of concern for Claire Conroy. On the contrary, it flows from a very deep sympathy for her sad plight. The disagreement among the participants involves differences in perception about what helping this patient means under the circumstances of this case.
*527 Life is our most basic possession. The will to stay alive is probably our strongest instinctive drive. As a general proposition, the protection of life is one of the law's strongest imperatives, and preservation of life is the major goal of medical practice. The interest of the State in preserving life is so great that courts have ordered medical procedures to be performed on patients even though the patients were competent and had objected to the procedure. In these cases, however, the expectation is that the patient will have a reasonably full and vibrant life after the treatment has been performed. There is a point at which a patient, or someone acting for him if he is incompetent, has the right to refuse treatment. That point is reached when intellectual functioning is permanently reduced to a very primitive level or when pain has become unbearable and unrelievable. See In re Quinlan, 70 N.J. 10 (1976); John F. Kennedy Memorial Hosp. v. Heston, 58 N.J. 576 (1971); In re Quackenbush, 156 N.J. Super. 282 (Cty.Ct. 1978).
When we deal with questions such as the ones presented in this case, a certain basic humility and a sense of one's own limitations are appropriate. We know that mankind's understanding of the ultimate meaning of life, suffering and death is (and probably always will be) flawed and limited. Many of us believe that an abiding reverence for life is perhaps our most special and most worthy human characteristic, but most of us would agree that when a person has been permanently reduced to a very primitive intellectual level or is permanently suffering from unbearable and unrelievable pain there is no valid human purpose to be served by employing active treatment designed to prolong life. Every sick human being is entitled to loving care, but there comes a time in the loving care of some patients when the proper decision is to let nature take its course, to allow the patient to die.
Even when we decide that it is proper to withhold active treatment, it would be wrong to act directly to terminate life or to withdraw nourishment, fluids, shelter or normal supportive care such as washing and body positioning. When I say that it *528 would be wrong to withdraw nourishment or fluids, I mean that it would be wrong to refuse to give them to the patient if she could take them herself or with the manual assistance of others. It would also be wrong to withhold medications which would reduce pain without unduly prolonging life. I conclude that these things would be wrong because I perceive a need in this area of decision making (1) to recognize the limitations of our understanding of life, suffering and death, (2) to continue a fundamental respect for life even in the most dire human circumstances and (3) to keep in place some fairly simple conceptual controls designed to give some measure of protection against ill-informed or badly motivated decisions.
In this case plaintiff's counsel has argued that the tube should be removed because it constitutes an extraordinary means of treatment. I know that the distinction between "extraordinary" and "ordinary" means of treatment is frequently made in this area of concern, but I must say that I do not find this terminology particularly helpful. It seems to me that the critical factor is the condition of the patient. I mean here both the present condition and the reasonably predictable future condition. If the patient can be restored by treatment to some meaningful level of intellectual functioning and to some acceptable level of comfort, then the full range of medical knowledge, skill and technology which is available should be brought into action as a matter of ordinary routine. Conversely, if the clear prognosis is that the patient will never return to some meaningful level of intellectual functioning and to some acceptable level of pain, then virtually every act of treatment other than the simple care mentioned in the preceding paragraph is inappropriate and is extraordinary. The focus of inquiry should be upon whether the life of the patient has become and is likely to remain impossibly burdensome to the patient. If the patient's life has become impossibly and permanently burdensome, then we simply are not helping the patient by prolonging her life, and active treatment designed to prolong life becomes utterly pointless and probably cruel. (I hasten to add that I know that *529 persons who advocate active treatment under these circumstances do not intend to be cruel. They are, of course, acting with the intention to help the patient.)
I know that people sometimes say that physicians frequently and courts less frequently "play God" in this area of decision making. There is a sense in which that statement is true, but it seems to me that the implied criticism it contains is not valid. This is not an area where mere mortals are presumptuously reaching out to make decisions beyond their legitimate capabilities. Until fairly recently in the course of human history, nature solved many of our problems without our having much to say about it. With the rapid recent development of medical knowledge, skill and technology has come a broadly expanding ability to intervene in what would otherwise be the normal flow of nature and to prolong life significantly for many human beings. This is generally a good thing. However, it is not an unqualifiedly good thing. Presently available knowledge, skills and technology (to say nothing of what the future may hold) now give us the ability to prolong some lives which ought not be prolonged. We cannot mindlessly and indiscriminately act to prolong all lives, by all means, under all circumstances. We must make some choices.
Of course, once we human beings start making choices we start making mistakes. It is inevitable that we will allow some people to die when we could have and should have prolonged their lives. But we cannot let this fear of error force us into abdicating our basic human responsibility to make choices. The fear of error should be used constructively as an incentive to make our choices carefully and soundly.
I am firmly convinced by the evidence in this case that Claire Conroy's intellectual functioning has been permanently reduced to an extremely primitive level. She suffers from all of the medical problems mentioned above. The general state of her health is very poor and will remain so. Her life has become impossibly and permanently burdensome for her. Prolonging *530 her life would not help her. It would be a wrong to her. The nasogastric tube should be removed, even though that will almost certainly lead to death by starvation and dehydration within a few days, and even though that death may be a painful one for the patient.

Some Misgivings
The nasogastric tube involved in this case is a very simple device. It is so simple that when I first started to think about removing it, I worried that I was getting perilously close to a straightforwardly wrongful refusal to feed a fellow human being. However, I think that there is a real difference between failing to feed a patient who could take nourishment by herself, or with the manual assistance of others, and failing to keep a nasogastric tube in a patient who has permanently lost the ability to swallow. For one thing, I think that the permanent loss of the ability to swallow is often reflective of a vast impairment of brain functioning. For another, I think that nature may be telling us something about a patient when the ability to swallow is permanently lost.
I have also had some misgivings about an inappropriate impact that a decision such as the present one might have on the treatment of elderly senile persons or on the treatment of retarded persons of all ages. Sometimes people incorrectly evaluate the meaningfulness of the lives of the senile or the retarded. As viewed by some, a decision such as the present one might lead to a wrongful withholding of treatment for the senile or the retarded. Here, I can only say that careful distinctions have to be made. The present patient is functioning at a virtually zero intellectual level. Most people who are suffering from organic brain syndrome and are broadly thought of as being senile operate at an appreciably higher mental level, although their intellect is markedly impaired. They are capable of loving and of responding to love. They are not in the same category as this poor woman. If they become injured or ill, active treatment is mandatory. I am sure that the same is true *531 for most retarded persons. When we think about the problems of the elderly senile and the retarded, we know that we have to be very careful about premature and wrongful withdrawal of treatment.

Judicial Involvement
In the Quinlan case the New Jersey Supreme Court indicated that judicial involvement in this area of decision making is not necessary in every case, and, indeed, might sometimes be inappropriate. See In re Quinlan, supra, 70 N.J. at 38-55. That view is clearly a sound one. As often as possible, the patient, the family and the physicians involved should make these decisions for themselves.
However, fairly frequently judicial involvement is necessary. Sometimes the patient is incompetent and has not prior to her incompetency given any clear indication of what her desires might be. (This is so in the present case.) Sometimes the family is divided in its views. Sometimes physicians differ among themselves or with members of the family. (This is so in the present case.) When one or more of these factors are present, judicial involvement is indicated.
It should also be noted that the kind of medical ethics committee envisioned by the Quinlan case as being available in the typical hospital is not, in fact, in place in many New Jersey hospitals. Such a committee is not available in the typical nursing home. Thus, the kind of solid private institutional support and monitoring of decisions contemplated by the New Jersey Supreme Court in Quinlan is frequently not a reality. This means more judicial involvement than would otherwise be the case.
I might also note that I would have some misgivings about a plaintiff such as the present one making basic decisions about termination of treatment without being subject to some kind of *532 judicial scrutiny. Mr. Whittemore is an intelligent and decent man. He is the legal guardian of the patient. He certainly means well for the patient. I believe that in this case he has, in fact, reached the right decision about the nasogastric tube. However, he is only a nephew of the patient, and is, thus, not a particularly close relative. He does not stand in the same relationship to her as would a parent, a spouse, a sibling or a child. Hence, his views are perhaps somewhat less relevant than would be those of a closer relative.
There is a need for some public monitoring of the trend of decisions in this area. Physicians have a technical expertise, a frequent contact and a professional moral sensitivity which entitle their views to great deference. However, they do not have the public perception and the public responsibility which courts have. Judicial involvement from time to time is, I think, helpful to the integrity and validity of decision making in this area.

JUDGMENT[*]
For the reasons stated above, on this 2nd day of February, 1983, it is ADJUDGED and ORDERED as follows:
1. Thomas C. Whittemore, as guardian of Claire C. Conroy, has the right to cause the removal of the nasogastric tube presently inserted in Claire C. Conroy. The actual removal is to be made by a qualified health care professional person who has no personal or professional objection to such removal.
2. Although it is expected that the removal of the tube will lead to suffering and death, the guardian and health care personnel retained by him must take reasonable steps to minimize the discomfort of Claire C. Conroy during her passage from life.
NOTES
[*] Following the issuance of the judgment, but before the nasogastric tube could be removed, the patient died on February 15, 1983.