190 N.J. Super. 453 (1983)
464 A.2d 303
IN THE MATTER OF CLAIRE C. CONROY.
Superior Court of New Jersey, Appellate Division.
Argued May 11, 1983.
Decided July 8, 1983.
*455 Before Judges MICHELS, PRESSLER and TRAUTWEIN.
John J. DeLaney, Jr., guardian ad litem for Claire C. Conroy, appellant, argued the cause pro se (Young, Rose & Millspaugh, of counsel; John J. DeLaney, Jr., on the brief).
William I. Strasser argued the cause for respondent Thomas C. Whittemore, guardian of Claire C. Conroy (Donohue, Donohue, Costenbader & Strasser, attorneys; William I. Strasser, of counsel and on the brief).
Joseph H. Rodriguez, Public Advocate, intervenor-appellant, argued the cause pro se (Herbert D. Hinkle, Deputy Public Advocate, and Linda J. Robinson, Assistant Deputy Public Advocate, on the brief).
Mary K. Brennan argued the cause for amicus curiae New Jersey Hospital Association (Sterns, Herbert & Weinroth, attorneys; Frank J. Petrino and Mary K. Brennan, of counsel; Richard M. Hluchan, on the brief).
The opinion of the Court was delivered by MICHELS, P.J.A.D.
John J. DeLaney, Jr. (DeLaney), guardian ad litem of Claire C. Conroy (Conroy), appeals from a judgment of the Chancery Division entered following a plenary trial, which declared that Thomas C. Whittemore (Whittemore) as guardian of Claire C. Conroy had "the right to cause the removal of the nasogastric *456 tube presently inserted in Claire C. Conroy." In re Conroy, 188 N.J. Super. 523, 532 (Ch.Div. 1983). Conroy at the time the order was entered was 84 years old and suffered from severe organic brain syndrome and a myriad of other physical problems. Unable to swallow sufficient amounts of food and water for her own sustenance, she was being nourished through a nasogastric feeding tube. The judgment under review was stayed by this court pending appeal; Conroy died of natural causes while the appeal was pending.
The facts relevant to this appeal are not in substantial dispute. From her teens until her retirement at age 62 or 63, Conroy was employed by a cosmetics company. She never married, but was devoted to her three sisters and her several cats. The last of her sisters died in 1975, leaving her nephew Whittemore as her only living relative. According to Whittemore, Conroy began to show signs of confusion some time before 1979. In 1979 he petitioned for and was granted guardianship of Conroy, whom he then placed in the Parklane Nursing Home (Parklane). According to Dr. Ahmed Kazemi, Conroy's physician at Parklane, Conroy was ambulatory upon her admission but was somewhat confused as the result of organic brain syndrome.[1] With the passage of time, this condition became progressively more severe and her ability to walk, reason and feed herself deteriorated. In 1982 she developed necrotic ulcers on her left foot as a complication of diabetes. At this time, she was unable to maintain a conversation because of her extreme confusion, but was aware of and could respond to commands.
On July 23, 1982, after observing that Conroy was not eating, Dr. Kazemi placed her on a nasogastric tube, which is a simple *457 flexible plastic tube that is run through the patient's nose into the stomach and through which liquid nutrients are passed. Except for a two-week period in October and November 1982, during which time she was fed pureed food but with poor results, this tube remained in place until her death. Conroy was unable to swallow sufficient quantities of food and water to live without the help of the nasogastric tube.
Dr. Kazemi further testified at trial that Conroy was not brain dead,[2] not comatose, and not in a chronic vegetative state.[3] Dr. Bernard Davidoff, who testified for the guardian ad litem DeLaney, described Conroy's mental state as "severely demented." Severe contractions of her lower legs kept her in a semi-fetal position. Although Conroy did not respond to verbal stimuli, she followed movements with her eyes, used her hands to scratch herself, and was able to move her head, neck, arms and hands voluntarily. Catherine Rittel, an administrator-nurse *458 at Parklane, testified that Conroy smiled when she was massaged or her hair was combed and moaned when she was fed.
Neither physician could determine whether Conroy could feel pain. They speculated that although her gangrene and ulcers did not seem to be a source of pain, the leg contractions probably were. According to the physicians' testimony, if the nasogastric tube were to have been removed, Conroy would have died of dehydration and starvation in about a week. Dr. Kazemi described this as a painful death. Moreover, the trial judge recognized that "the removal of the tube will lead to suffering and death," and ordered the guardian and health care personnel "to take reasonable steps to minimize [Conroy's] discomfort ... during her passage from life." 188 N.J. Super. at 532.
The physicians agreed there was no chance of an improvement in Conroy's mental condition. Dr. Davidoff observed, however, that none of Conroy's medical conditions was fatal and therefore that it could not be predicted when or from what cause Conroy would die.

I.

THE ISSUE OF MOOTNESS
We first address the guardian ad litem's contention (withdrawn at oral argument) that this appeal should be dismissed because it has become moot. It is true, of course, that Conroy's death has rendered the issues that underlie this appeal moot. There no longer is a threat that the State will compel the continued treatment of Conroy against the exercise of her right to privacy or that the nasogastric tube will be removed contrary either to her best interests or to the State's interest in the preservation of life. Therefore, the conflict between the parties has become merely hypothetical. Nevertheless, we conclude that the importance of the issues presented by this appeal requires their resolution notwithstanding their mootness.
*459 Although New Jersey's courts are not bound by the "case or controversy" requirement that U.S. Const., Art. III, § 2 imposes on federal courts, see Salorio v. Glaser, 82 N.J. 482, 490-491 appeal dismissed and cert. den. 449 U.S. 804, 101 S.Ct. 49, 66 L.Ed.2d 7 (1980); Crescent Pk. Tenants Ass'n v. Realty Eq. Corp. of N.Y., 58 N.J. 98, 107-108 (1971), our courts ordinarily will refuse to review questions that have become academic prior to judicial scrutiny out of reluctance to render a legal decision in the abstract and a desire to conserve judicial resources. See, e.g., Oxfeld v. New Jersey State Board of Education, 68 N.J. 301, 303-304 (1975); Sente v. Clifton, 66 N.J. 204, 205 (1974); Handabaka v. Division of Consumer Affairs, 167 N.J. Super. 12, 14 (App.Div. 1979).
Nevertheless, our courts will decide a moot case that presents issues of great public importance or is based upon a controversy capable of repetition, yet evading review because of the short duration of any single plaintiff's interest. See e.g., Guttenberg Sav. & Loan Ass'n v. Rivera, 85 N.J. 617, 622-623 (1981); Dunellen Educ. Bd. v. Dunellen Educ. Ass'n, 64 N.J. 17, 22 (1973); John F. Kennedy Mem. Hosp. v. Heston, 58 N.J. 576, 579 (1971); State v. Union Cty. Park Comm'n, 48 N.J. 246, 248-249 (1966); East Brunswick Tp. Educ. Bd. v. E. Brunswick Tp. Council, 48 N.J. 94, 109 (1966); State v. Perricone, 37 N.J. 463, 469, cert. den. 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962); Playcrafters Student Members v. Teaneck Tp. Educ. Bd., 177 N.J. Super. 66, 73-74 (App.Div.), aff'd o.b. 88 N.J. 74 (1981); Humane Society of the U.S. v. Guido, 173 N.J. Super. 223, 228 (App.Div. 1980). See generally Busik v. Levine, 63 N.J. 351, 363-364, appeal dismissed 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973).
The issues presented by this appeal are of such great public importance that their resolution is clearly warranted. This appeal offers an opportunity to provide guidance to family members, guardians, physicians and hospitals, the need for which extends far beyond the facts of this case. Moreover, this *460 is the type of case that is capable of repetition, yet which evades review because the patients involved often die during the course of litigation. Cf. Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712-13, 35 L.Ed.2d 147 (1973). For these reasons, courts have consistently agreed to decide the rights of terminally ill patients to refuse life-sustaining treatment even after the patients have died or recovered. See John F. Kennedy Mem. Hosp. v. Heston, supra, 58 N.J. at 579; State v. Perricone, supra, 37 N.J. at 469; Matter of Spring, 380 Mass. 629, 405 N.E.2d 115 (1980); Superintendent of Belchertown v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977); Matter of Storar, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 268-69, 420 N.E.2d 64, 66-67 (Ct.App.), cert. den. 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981).

II.

CONROY'S RIGHT TO PRIVACY
We turn, then, to the merits of this appeal.[4] The basic issue before us is whether the judgment here entered represents a legally permissible application of the principles of In re Quinlan, 70 N.J. 10, cert. den. 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). The decision in Quinlan was based upon the patient's right of privacy which was deemed, under the circumstances there, to outweigh the State's interest in the preservation of life. The question then is whether under the circumstances here there was also a right of privacy which outweighed that paramount state interest and which therefore could justify the withdrawal of life-sustaining nourishment from this patient. *461 If the State's interest in the preservation of life outweighs the patient's right of privacy, such withdrawal would be an act of euthanasia, constituting homicide. It is only if the right of privacy could be reasonably deemed to prevail that withdrawal would be legally permissible under the Quinlan doctrine. We reverse the judgment here entered because in our view we regard it as the authorization of euthanasia.
The right to privacy is recognized under the United States Constitution as a "penumbra" derived from several more specific constitutional guarantees. See Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). This right is also protected by N.J. Const. (1947), Art. I, par. 1. In re Grady, 85 N.J. 235, 249 (1981); State v. Saunders, 75 N.J. 200, 210-217 (1977). The right to privacy is not absolute, however; it must yield to important state interests in areas protected by that right. Roe v. Wade, supra, 410 U.S. at 155, 93 S.Ct. at 727-28. In In re Quinlan, supra, the Supreme Court of New Jersey applied the right to privacy balance to a comatose patient's petition to discontinue extraordinary life-sustaining treatment.
When the Quinlan case was decided, its subject  Karen Ann Quinlan  was a 22-year-old woman in an irreversible coma, a symptom of severe brain damage caused by prolonged anoxia. Karen was in a "chronic vegetative state," in which she retained neurological control over her blood pressure, heart rate, chewing, swallowing, sleeping and waking, but lost all more sophisticated brain stem and higher neurological functions. Thus, although she reacted to light, sound and noxious stimuli on a primitive reflex level, she was not consciously aware of her surroundings: she had no cognitive function. No existing medical technique could have been expected to restore her to cognitive or sapient life.
One of the brain stem functions Karen Quinlan was believed to have lost was the ability to breathe unassisted. Therefore she was connected to a respirator, described by the Quinlan *462 court as "a sophisticated machine which delivers a given volume of air at a certain rate and periodically provides a `sigh' volume, a relatively large measured volume of air designed to purge the lungs of excretions." 70 N.J. at 25. Karen was fed by nasogastric tube.
Karen's father, Joseph Quinlan, sought an adjudication that his daughter was incompetent and a declaration that he be her guardian with the power to authorize discontinuance of "all extraordinary medical procedures now allegedly sustaining Karen's vital processes and hence her life."[5] The Supreme Court reversed the Chancery Division's judgment and granted the father's request. The Quinlan court saw the right to privacy as requiring a balancing of the State's interest in preserving life and the patient's interest in freedom from the burden of continued treatment. The Court reasoned:
The claimed interests of the State in this case are essentially the preservation and sanctity of human life and defense of the right of the physician to administer medical treatment according to his best judgment. In this case the doctors say that removing Karen from the respirator will conflict with their professional judgment. The plaintiff answers that Karen's present treatment serves only a maintenance function; that the respirator cannot cure or improve her condition but at best can only prolong her inevitable slow deterioration and death; and that the interests of the patient, as seen by her surrogate, the guardian, must be evaluated by the court as predominant, even in the face of an opinion contra by the present attending physicians. Plaintiff's distinction is significant. The nature of Karen's care and the realistic chances of her recovery are quite unlike those of the patients discussed in many of the cases where treatments were ordered. In many of those cases the medical procedure required (usually a transfusion) constituted a minimal bodily invasion and the chances of recovery and return to functioning life were very good. We think that the State's interest contra weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest. It is for that reason that we believe Karen's choice, if she were competent to make it, would be vindicated by the law. Her prognosis is *463 extremely poor,  she will never resume cognitive life. And the bodily invasion is very great,  she requires 24 hour intensive nursing care, antibiotics, the assistance of a respirator, a catheter and feeding tube. [70 N.J. at 40-41.]
A similar legal analysis has been employed by other jurisdictions in this type of case. See In re Severns, 425 A.2d 156, 158-159 (Del. Ch. 1980); Satz v. Perlmutter, 362 So.2d 160, 162-163 (Fla.App. 1978), aff'd o.b. 379 So.2d 359 (Fla.Sup.Ct. 1980); Matter of Spring, supra, 380 Mass at 639-42, 405 N.E.2d at 122-123; Superintendent of Belchertown v. Saikewicz, supra, 373 Mass. at 740-45, 370 N.E.2d at 425-427; Leach v. Akron Gen. Med. Ctr., 68 Ohio Misc. 1, 426 N.E.2d 809, 814-815 (Ct. Common Pleas 1980); Matter of Welfare of Colyer, 99 Wash.2d 114, 660 P.2d 738, 741-744 (1983). The New York Court of Appeals, though it based its decision on nonconstitutional grounds, has adopted a similar balance of interests standard in resolving this type of case. Matter of Storar, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 275-276, 420 N.E.2d 64, 73-74, cert. den. 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981).
Application of the Quinlan right to privacy standard requries an examination of the relative interests of the State and the patient in the continuation or withdrawal of treatment.

A.

The Patient's Prognosis as Determining the State's Interest
The State's interest in preserving a patient's life is small with regard to the hopelessly ill or irreversibly comatose patient, but great with regard to the patient whose condition will substantially improve as the result of continued treatment. This distinction is borne our by the case law. In John F. Kennedy Mem. Hosp. v. Heston, supra, 58 N.J. at 581-585, our Supreme Court ordered blood transfusions for a young woman who required surgery to save her life, despite her mother's objections on religious grounds. The court emphasized the State's interest in preserving the life of a patient who, if treated, may enjoy long life and good health:

*464 Appellant suggests there is a difference between passively submitting to death and actively seeking it. The distinction may be merely verbal, as it would be if an adult sought death by starvation instead of a drug. If the State may interrupt one mode of self-destruction, it may with equal authority interfere with the other. It is arguably different when an individual, overtaken by illness, decides to let it run a fatal course. But unless the medical option itself is laden with the risk of death or of serious infirmity, the State's interest in sustaining life in such circumstances is hardly distinguishable from its interest in the case of suicide. [58 N.J. at 581-582.]
See also Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson, 42 N.J. 421, 423, cert. den. 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964); State v. Perricone, supra, 37 N.J. at 475-477.
This distinction has been recognized by the Supreme Judicial Court of Massachusetts. In Superintendent of Belchertown v. Saikewicz, supra, that court granted an application to discontinue chemotherapy in the case of a 67-year-old man suffering from terminal and incurable leukemia. However, the opposite result was reached in Commissioner of Correction v. Myers, 379 Mass. 255, 399 N.E.2d 452 (1979). The patient in that case was a 24-year-old prisoner who suffered from a chronic kidney condition. Dialysis would have allowed him to lead a relatively normal and healthy life; without the dialysis, he would have died within ten to fifteen days. The court found that the balance of interests tipped toward the State. It observed:
In contrast, the State's interest in the preservation of life is directly implicated here. Characterized as "the most significant of the asserted State interests," id. [373 Mass.] at [741], 370 N.E.2d at 425, this particular concern was outweighed in Saikewicz by the crucial fact that the patient's leukemia was incurable and would soon cause death regardless of any medical treatment. As we observed, "[t]here is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where ... the issue is not whether, but when, for how long, and at what cost to the individual that life may be briefly extended." id. at [742], 370 N.E.2d at 425-426.
Myers' prognosis contrasts sharply with that of Saikewicz. Although Myers' kidney disease prior to the transplant could be technically classified as "incurable," it clearly was not life-threatening in the sense that his "life [would] soon, and inevitably, be extinguished" regardless of the treatment he received. Id. at [742], 370 N.E.2d at 425. On the contrary, continued dialysis and medication permitted Myers to live an otherwise normal and healthy life, and following the kidney transplant, daily medication presently provides the possibility of complete cure. Therefore, compelling Myers to take his medication, or, in the regrettable *465 event that his body rejects the transplanted kidney, compelling him to submit to dialysis does not involve a situation where "heavy physical and emotional burdens" would be imposed "to effect a brief and uncertain delay in the natural process of death." Id. at [744], 370 N.E.2d at 427. Consequently, the State's interest in the preservation of life is "quite strong" in this instance. See Custody of a Minor, [375] Mass. [733], [755] n. 12, 379 N.E.2d 1053 (1978). [399 N.E.2d at 456.]
By contrast, courts have been far more ready to allow an irreversibly comatose or incurably terminally ill person to refuse treatment. See, e.g., In re Severns, supra (comatose chronic vegetative patient); Satz v. Perlmutter, supra (patient suffering from incurable terminal amyotrophic lateral sclerosis); Matter of Spring, supra (comatose chronic vegetative patient); Leach v. Akron Gen. Med. Ctr., supra (semi-comatose, vegetative patient suffering from terminal amyotrophic lateral sclerosis); Matter of Welfare of Colyer, supra (comatose chronic vegetative patient). See also In re Quackenbush, 156 N.J. Super. 282, 288-290 (Cty.Ct. 1978).
We conclude that Conroy's prognosis supports a significantly greater state interest in continued treatment than in the cases cited above. At the time of trial, Conroy was unable to move from a fetal position and had a severely limited ability to respond to her surroundings. However, she was not in a chronic vegetative state; she was simply very confused. Dr. Kazemi testified that because Conroy was aware of some external stimuli and responded to them, she was neither vegetative nor comatose. This testimony draws a very different picture from that drawn in the Quinlan case. It seems to describe a woman who, like an infant less than a year old, experienced and responded to her surroundings but lacked the intellectual capacity to understand most of them. By comparison, Karen Quinlan was unaware of her environment and had only the most reflexive reactions to outside stimuli:
The further medical consensus was that Karen in addition to being comatose is in a chronic and persistent "vegetative" state, having no awareness of anything or anyone around her and existing at a primitive reflex level. Although she does have some brain stem function (ineffective for respiration) and has other reactions one normally associates with being alive, such as moving, reacting to *466 light, sound and noxious stimuli, blinking her eyes, and the like, the quality of her feeling impulses is unknown. She grimaces, makes sterotyped cries and sounds and has chewing motions. Her blood pressure is normal. [70 N.J. at 25.]
The distinction between an "awake" but confused patient like Conroy and an "asleep," vegetative patient like Karen Quinlan is material and is determinative in this case. The Quinlan court held that the State's interest in preserving a patient's life depends on whether the patient ever will return to cognitive, sapient life. 70 N.J. at 41. Thus, it is plain that Quinlan applies only to noncognitive, vegetative patients.[6] The Quinlan court evidently was of the opinion that the State's interest in preserving life outweighs the patient's right to privacy when the patient retains the capacity to relate to the outside world. In the present case, Conroy was sapient, but lacked the intellectual capacity to understand what she observed. Under the principles of the Quinlan case, the State had a substantial and overriding interest in preserving her life.
We are also troubled by the trial judge's framing of the issue as whether the patient will return "to some meaningful level of intellectual functioning." Put simply, to allow a physician or family member to discontinue life-sustaining treatment to a person solely because that person's lack of intellectual capacity precludes him from enjoying a meaningful quality of life would establish a dangerous precedent that logically could be extended far beyond the facts of the case now before us. In our view, the right to terminate life-sustaining treatment based on a guardian's substituted judgment should be limited to incurable and terminally ill patients who are brain dead, irreversibly comatose or vegetative and who would gain no medical benefit from continued treatment. A fortiori, there can be no justification for withholding nourishment, which is really not "treatment" at all (see § IIB below), from a patient who does not *467 meet these criteria. Any further extension of the Quinlan rule would place into the hands of physicians, family members and judges the determination of whose quality of life is so slight that he should not be kept alive.[7]

B.

The Nature of Treatment as Defining the Patient's Interest
"[T]he individual's right to privacy grows as the degree of bodily invasion increases." In re Quinlan, supra, 70 N.J. at 41. In our view, "bodily invasion" means not only the degree of physical discomfort, incapacitation or debilitation a given treatment will cause a patient, but also the feelings of helplessness, dependence and loss of dignity the treatment will engender. Thus, the patient's interest in privacy is greater when his medical condition requires 24-hour care, dependence on machines to carry on bodily functions, or regular exposure and handling of his body. See ibid. The courts seem to have accepted this rule, in that they have been far more willing to allow patients to refuse complex, highly intrusive treatments like respirators (In re Severns, supra; In re Quinlan, supra; Leach v. Akron Gen. Med. Ctr., supra; Matter of Colyer, supra), hemodialysis (In re Spring, supra), chemotherapy (Superintendent of Belchertown v. Saikewicz, supra) or amputation (In re Quackenbush, supra) than to refuse a simple and routine treatment like a blood transfusion (see John F. Kennedy Mem. Hosp. v. Heston, supra; State v. Perricone, supra). As the court explained in In re Quackenbush,

*468 The Quinlan decision distinguished Heston, noting that a blood transfusion is a minimal bodily invasion and that the woman had a potential for vibrant health and long life. That distinction is viable in this case. Mr. Quackenbush is confronted with a significant bodily invasion and does not have the long life and vibrant health potential.
The extent of the bodily invasion required to overcome the State's interest is not defined in Quinlan. Further, there is a suggestion of a need for a combination of significant bodily invasion and a dim prognosis before the individual's right of privacy overcomes the State's interest in preservation of life. Under the circumstances of this case, I hold that the extensive bodily invasion involved here  the amputation of both legs above the knee and possibly the amputation of both legs entirely  is sufficient to make the State's interest in the preservation of life give way to Robert Quackenbush's right of privacy to decide his own future regardless of the absence of a dim prognosis. [156 N.J. Super. at 288-289.]
In this light, the treatment given to Conroy differs significantly from that given Karen Quinlan. The bodily invasion necessary to treat Karen Quinlan was "very great." 70 N.J. at 41. It included 24-hour intensive nursing care, antibiotics and the assistance of a respirator, a catheter and a feeding tube. As a result, her personal dignity was taken from her and she was placed in a position of helplessness and dependence. In contrast, Conroy was in the less restrictive environment of a nursing home, was not subject to intensive nursing care, and had none of her bodily functions replaced by a machine. The nasogastric tube was no more than a simple device which was part of Conroy's routine nursing care. It was not really "medical treatment" at all. In truth, Conroy was little different from the many other ill, senile or mentally disabled persons who are bedridden and cared for in nursing homes. Consequently, the bodily invasion she suffered as the result of her treatment was small, and should not be held to outweigh the State's interest in preserving her life.
No reported case has considered whether an artificial means of feeding may be withdrawn from an irreversibly ill or comatose patient. However, similar considerations were before the New York Court of Appeals in In re Storar, supra, 438 N.Y.S.2d at 275-276, 420 N.E.2d at 73-74. The patient in that case was a 52-year-old profoundly retarded man who was diagnosed as *469 having terminal and incurable cancer of the bladder. Storar would die within six months. To maintain his health until then, he required blood transfusions every eight to fifteen days. Storar disliked the transfusions and was frightened by them and the blood in his urine they caused. Without them, he would die within weeks. The trial judge denied the hospital's petition to continue the transfusions over the patient's mother's objections. The Court of Appeals reversed, in language highly relevant to the present appeal:
In the Storar case there is the additional complication of two threats to his life. There was cancer of the bladder which was incurable and would in all probability claim his life. There was also the related loss of blood which posed the risk of an earlier death, but which, at least at the time of the hearing, could be replaced by transfusions. Thus, as one of the experts noted, the transfusions were analogous to food  they would not cure the cancer, but they could eliminate the risk of death from another treatable cause. Of course, John Storar did not like them, as might be expected of one with an infant's mentality. But the evidence convincingly shows that the transfusions did not involve excessive pain and that without them his mental and physical abilities would not be maintained at the usual level. With the transfusions on the other hand, he was essentially the same as he was before except of course he had a fatal illness which would ultimately claim his life. Thus, on the record, we have concluded that the application for permission to continue the transfusions should have been granted. Although we understand and respect his mother's despair, as we respect the beliefs of those who oppose transfusions on religious grounds, a court should not in the circumstances of this case allow an incompetent patient to bleed to death because someone, even someone as close as a parent or sibling, feels that this is best for one with an incurable disease. [438 N.Y.S.2d at 275-276, 420 N.E.2d at 73-74.]
The same reasoning applies to the withdrawal of food and water from a patient. Nourishment does not itself cure disease. Neither is it an artificial life-sustaining device. Rather it is a basic necessity of life whose withdrawal causes death and whose provision permits life to continue until the patient dies of his illness or injury. Whether nourishment may ever be withdrawn from a patient whose medical condition is unlikely to improve is not the issue here. We hold only that when nutrition will continue the life of a patient who is not comatose, brain dead or vegetative, and whose death is not irreversibly imminent, *470 its discontinuance cannot be permitted on the theory of the patient's right to privacy or, indeed, on any other basis.

III.

THE ETHICAL QUESTIONS
While we are satisfied that the proper balance between the preservation of life and the patient's right to privacy requires the result we have here reached, we are also persuaded that this result is dictated by ethical concerns as well.
The ethical question implicit in the decision whether to discontinue life-sustaining measures has traditionally been expressed by the distinction between "ordinary" and "extraordinary" treatment. The standard definition of these terms is given as follows:
Ordinary means are all medicines, treatments, and operations which offer a reasonable hope of benefit and which can be obtained and used without excessive expense, pain, or other inconvenience. Extraordinary means are all medicines, treatments, and operations which cannot be obtained or used without excessive expense, pain, or other inconvenience, or if used, would not offer a reasonable hope of benefit. [G. Kelly, Medico-Moral Problems 129 (1958).]
An alternative formulation is proposed in Lewis, "Machine Medicine and its Relation to the Fatally Ill," 206 J.A.M.A. 387, 390 (1968), as follows:
Ordinary measures of patient care are recognized as elements of essential care. They represent obligatory, proven, and justified therapies and procedures.... They further represent measures which [the patient] can reasonably undergo with only minimal or moderate danger and maximal effectiveness. Such measures are also not an impossible or excessive burden.
Extraordinary measures ... are complicated methods. They are impossible for the patient to use or apply by himself and present a costly and difficult burden.... [T]hey represent a high level of danger, and the results expected are not predictable, i.e., the effectiveness is minimal or moderate while the dangers are maximal.
Thus, the definition of "extraordinary treatment" is fluid, and depends on both the nature of the treatment and the patient's *471 prognosis.[8] As the Supreme Court said in Quinlan,
... [o]ne would have to think that the use of the same respirator or like support could be considered "ordinary" in the context of the possibly curable patient but "extraordinary" in the context of the forced sustaining by cardio-respiratory processes of an irreversibly doomed patient. [70 N.J. at 48.]
There is substantial disagreement among ethicists whether the provision of food and water should ever be considered extraordinary treatment. It is in fact recognized that the terms "extraordinary treatment" and "ordinary treatment" elude certain definition. To some, the natural and ordinary quality of feeding dictates that it should never be withdrawn. See Healy, Medical Ethics 61-77 (1960); McFadden, Medical Ethics 227-247 (1961); O'Donnell, Morals in Medicine 57, 66-68 (1959). A code of treatment for severely ill children, drafted by the Nassau (N.Y.) Pediatric Society Committee on Ethics and Survival, provides that "ordinary measures are food, fluids, oxygen, antibiotics and pain killers." Waldman, "Medical Ethics and the Hopelessly Ill Child," 88 J.Ped. 890, 892 (1976). This position recently was summed up by Surgeon General C. Everett Koop as follows: "Withholding fluids or nourishment at any time is an immoral act." Time, April 11, 1983, at 69.
Nevertheless, several scholars are of the opinion that if the patient is beyond all hope of recovery, the burden of continued feeding is disproportionate to the benefit it will effect. See Wilson, Death by Decision 70-71 (1975); Ramsey, "Prolonged Dying: Not Medically Indicated," 6 Hastings Ctr. Rep. ___ 14 (1976). The American Medical Association Judicial Council, in Opinion 2.11 (Jan. 10, 1981), reprinted at 45 Conn.Med. 721 (1981), concludes that when a patient is irreversibly comatose or *472 in a permanent vegetative state, "all means of life support may be discontinued."[9] Similar is this passage from the report of the President's Commission:
Most patients with permanent unconsciousness cannot be sustained for long without an array of increasingly artificial feeding interventions  nasogastric tubes, gastrotomy tubes, or intravenous nutrition. Since unconscious patients are not aware of nutrition, the only benefit of such increasingly burdensome interventions is the remote possibility of recovery. The sensitivities of the family and the care-giving professionals ought to determine whether such steps are undertaken.
The present appeal is not the proper vehicle by which to resolve this issue, and we expressly decline to do so. Even those ethicists who advocate the withdrawal of nourishment do so only when nourishment would offer no benefit to the patient, as when the patient is irreversibly comatose or permanently vegetative. In the words of Ramsey, supra, 6 Hastings Ctr. Rep. at 14:
I suggest that in a proper understanding of [the terms "ordinary means" and "extraordinary means"] (which are objectively relative to the patient's condition) the IV is as aimless as the respirator. It, too, is only prolonging Karen's dying. Surely it is not hunger that Karen feels now. To be on the safe side, perhaps we should say that she might experience dehydration. That is now the purpose of a *473 glucose drip: to give the comfort of a cup of cool water to a patient who has entered upon her own particular dying. If a glucose drip prolongs this patient's dying, it is not given for that purpose, or as means in a continuing useless effort to save her life.
If, as here, the patient is not comatose and does not face imminent and inevitable death, nourishment accomplishes the substantial benefit of sustaining life until the illness takes its natural course. Under such circumstances nourishment always will be an essential element of ordinary care which physicians are ethically obligated to provide.
There are involved here, moreover, ethical considerations which far transcend the ordinary-extraordinary dichotomy and its implications. In Quinlan the court reaffirmed the concept of the nondelegable judicial responsibility to determine issues involving the underlying and competing human values and rights here implicated. It also acknowledged that these determinations "must, in the ultimate, be responsive not only to the concepts of medicine but also to the common moral judgment of the community at large." 70 N.J. at 44. Thus, Quinlan made clear that when the medical issue is no longer "curing the ill but conforting and easing the dying" (id. at 47), the medical judgment is entitled to deference by the courts and society only in those cases in which, because of the condition of the patient and the nature of the life support system, the issue of sustaining life is not readily amenable to judicial resolution but is a matter for medical consensus based upon prevailing standards of practice and ethics. Id. at 47-48. Quinlan, involving an irreversibly comatose patient sustained by sophisticated and complex devices, presented just such a situation. This case does not. In our view, withdrawal of a nasogastric tube from a noncomatose patient not facing imminent death is not a method of "comforting and easing the dying" which either the courts or society can tolerate.
We are further convinced that the withdrawal of the feeding tube here would also violate medical ethics. It is clear that the physician's primary obligation is primum non nocere: First do *474 no harm. The Hippocratic Oath provides in part: "I will prescribe regimen for the good of my patients according to my ability and my judgment and never do harm to anyone." Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 74 (1980). As an extension of these maxims, medical ethicists have long distinguished between killing and letting die. Hyland and Baime frame the distinction as one between euthanasia ("the deliberate easing into death of a patient suffering from a painful and fatal disease") and antidysthanasia ("the failure to take positive action to prolong the life of an incurable patient"). Hyland & Baime, "In re Quinlan: A Synthesis of Law and Medical Technology," 8 Rut.-Cam.L.J. 37, 52 (1976). While the latter has gained acceptance in the medical community, the former always has been considered unethical. See Kary, "A Moral Distinction Between Killing and Letting Die," 5 J. Med. & Phil. 326 (1980); Dinello, "On Killing and Letting Die," 31 Analysis 83 (1971); but see Bennett, "Whatever the Consequences," 26 Analysis 83 (1966).
Thus, the American Medical Association Judicial Council has recommended that the following standard be adopted by courts and legislatures faced with issues of euthanasia or terminal illness:
The intentional termination of the life of one human being by another  mercy killing or euthanasia  is contrary to public policy, medical tradition, and the most fundamental measures of human value and worth. [Judicial Council, American Medical Association, Opinions and Reports para. 5.17 (1979).][10]
*475 Similarly, the Judicial Council's Opinion 2.11, quoted above, states, "For humane reasons, with informed consent a physician may do what is medically necessary to alleviate severe pain, but he should not intentionally cause death" (emphasis added).
The trial judge in the present case in effect authorized euthanasia rather than antidysthanasia. At the time of trial, Conroy, unlike the patients permitted to discontinue treatment in the other reported cases, was neither terminally ill nor critically injured and kept alive only by artificial means. She suffered from no specific life-threatening illness or injury, and she was not, apparently, suffering any pain. Her treatment consisted basically of providing the comforts of routine nursing care. If the trial judge's order had been enforced, Conroy would not have died as the result of an existing medical condition, but rather she would have died, and painfully so, as the result of a new and independent condition: dehydration and starvation. Thus, she would have been actively killed by independent means rather than allowed to die of existing illness or injury. Instead of easing her passage from life, the result of the judge's order would have been to inflict new suffering.
Such a result has frightening implications. When a patient, guardian or physician is permitted to decide that a nonterminal *476 patient's life is worthless and should be terminated rather than merely to decide that an artificially extended life should be allowed to expire naturally, the decision necessarily involves a judgment of the patient's quality of life. Such a precedent could be applied with equal force to circumstances much different from and less compelling than those present here. Therefore, we reject the extension of Quinlan to the active euthanasia of a patient.

IV.

CONCLUSION
In sum, the trial judge erred in holding that a non-comatose, non-brain-dead patient not facing imminent death, not maintained by any life-support machine, and not able to speak for herself should be painfully put to death by dehydration and starvation. Accordingly, the judgment so ordering is reversed.
NOTES
[1] "Organic brain syndrome" is defined as "[a] syndrome resulting from diffuse or local impairment of brain tissue function, manifested by alteration of orientation, memory, comprehension, and judgment." Dox, Melloni & Eisner, Illustrated Medical Dictionary 347 (1979). It is not the same as senile dementia, which is "mental deterioration caused by atrophy of the brain due to aging." Id. at 122.
[2] The Harvard Medical School Ad Hoc Committee's criteria for "brain death" were summarized as follows in In re Quinlan, 70 N.J. 10, 27 cert. den. 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976):

The Ad Hoc standards, carefully delineated, included absence of response to pain or other stimuli, pupilary reflexes, corneal, pharyngeal and other reflexes, blood pressure, spontaneous respiration, as well as "flat" or isoelectric electroencephalograms and the like, with all tests repeated "at least 24 hours later with no change."
[3] Dr. Fred Plum, an expert witness at the Quinlan trial, explained the difference between vegetative and sapient brain function:

We have an internal vegetative regulation which controls body temperature which controls breathing, which controls to a considerable degree blood pressure, which controls to some degree heart rate, which controls chewing, swallowing and which controls sleeping and waking. We have a more highly developed brain which is uniquely human which controls our relation to the outside world, our capacity to talk, to see, to feel, to sing, to think. [70 N.J. at 24.]
According to Cranford, "Ethical Viewpoint of a Neurologist," 45 Conn.Med. 722 (1981),
Patients in a persistent vegetative state have relatively intact brainstem functioning (vegetative functions such as breathing) but no cerebral cortical function at all, such as awareness of self or others or any degree of cognition.
[4] We observe that there is no contention that Whittemore is acting other than with the utmost sincerity and good faith, or that he is mistaken in concluding that Conroy would have asked to terminate treatment if she were able. We also find no merit in the guardian ad litem's contention that compliance with the trial judge's order will expose the guardian and the physician to criminal liability. The Quinlan court said specifically that one whose action is necessary to effectuate a patient's exercise of her right to privacy "is protected from criminal prosecution." 70 N.J. at 52.
[5] It is significant that at no time during or after the Quinlan litigation has Joseph Quinlan requested that Karen's nasogastric tube be removed. When asked if he desired that this tube be removed, he reportedly said in amazement, "Oh no. That is her nourishment." Ramsey, "Prolonged Dying: Not Medically Indicated," 6 Hastings Ctr. Rep. 14 (1976).
[6] Respondents rely on footnote 10 to the Quinlan opinion to support a contrary view. See 70 N.J. at 54 n. 10. That footnote, however, refers to "Do Not Resuscitate" orders, not to the termination of life-sustaining treatment.
[7] We note that the Report of the President's Commission for the Study of Ethical Problems in Medicine and Bio-medical and Behavioral Research, relied on heavily by respondents here, would restrict the discontinuance of life-sustaining treatment to "those in whom all possible components of consciousness are absent. This signifies an absence of all mental life, that is, of all thought, feeling, sensation, desire, emotion and awareness of self or environment.... [Such a patient] does not engage in purposive action, and manifests no other signs of mental activity." Therefore, the recommendations of the President's Commission do not apply to Claire Conroy.
[8] The terms "extraordinary treatment" and "ordinary treatment" do not admit to certain definition. As the President's Commission has pointed out, the term "extraordinary treatment" is "more of an expression of the conclusion than a justification for it." The trial judge in the present case found the distinction "not ... particularly helpful." 188 N.J. Super. at 528. The Quinlan court, at least on the record before it, found the distinction "somewhat hazy." 70 N.J. at 48. Nevertheless, these terms have come to have widely accepted meaning.
[9] Opinion 2.11 reads in full:

Terminal Illness
The social committment [sic] of the physician is to prolong life and relieve suffering. Where the observance of one conflicts with the other, the physician, patient, and/or family of the patient have discretion to resolve the conflict.
For humane reasons, with informed consent a physician may do what is medically necessary to alleviate severe pain, or cease or omit treatment to let a terminally ill patient die, but he should not intentionally cause death. In determining whether it is in the best interest of a terminally ill incompetent patient to administer potentially life-prolonging medical treatment, the physician should consider what the possibility is for extending life under humane and comfortable conditions and what are the wishes and attitudes of the family or those who have responsibility for the custody of the patient.
Where a terminally ill patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis, all means of life support may be discontinued.
The Council believes that these guidelines should apply as well, to the care of the patient in a permanent "vegetative" state.
[10] The entire relevant portion of para. 5.17 reads:

Although the AMA cannot prevent courts or legislatures from considering issues of euthanasia or terminal illness, recent experience indicates that these governmental bodies may not provide the best forums for such discussions. Even so, this cannot stop such discussions from taking place.
Accordingly, if a court or legislature is faced with this issue in the future, the Judicial Council recommends that the following statement be authorized or enacted:
(1) The intentional termination of the life of one human being by another  mercy killing or euthanasia  is contrary to public policy, medical tradition, and the most fundamental measures of human value and worth.
(2) The cessation of the employment of extraordinary means to prolong the life of the body when there is irrefutable evidence that biological death is imminent is the decision of the patient and/or his immediate family and/or his lawful representative, acting in the patient's best interest.
(3) The advice and judgment of the physician or physicians involved should be readily available to the patient and/or his immediate family and/or his lawful representative in all such situations.
(4) No physician, other licensed health care providers, or hospital should be civilly or criminally liable for taking any action pursuant to these guidelines, nor should there be any criminal or civil penalties of any sort imposed for conduct pursuant to these guidelines.
(5) Except as stated above, all matters not in the public domain relating to a patient's terminal illness are the private right of the patient and are protected from public scrutiny by the privacy and confidentiality of the physician-patient relationship.