PETER PROCANIK, AN INFANT BY HIS GUARDIAN AD LITEM, ROSEMARIE PROCANIK AND ROSEMARIE PROCANIK AND MICHAEL PROCANIK, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. JOSEPH PETER CILLO, HERBERT LANGER AND ERNEST P. GREENBERG, DEFENDANTS-RESPONDENTS, AND HAROLD A. SHERMAN, LEE S. GOLDSMITH AND GREENSTONE, GREENSTONE & NAISHULER, A PROFESSIONAL CORPORATION, DEFENDANTS.

Argued January 23, 1984—Decided August 1, 1984.

*Myron W. Kronisch* argued the cause for appellants (*Kronisch & Schkeeper*, attorneys).

*Russell L. Hewit* argued the cause for respondents (*Dughi & Hewit*, attorneys; *Robert D. Mulvee*, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue on this appeal is the propriety of a grant of a partial summary judgment dismissing a "wrongful life" claim brought by an infant plaintiff through his mother and guardian *ad litem*. That judgment, which was granted on the pleadings, dismissed the claim because it failed to state a cause of action upon which relief may be granted. *R.* 4:6–2(e).

The infant plaintiff, Peter Procanik, alleges that the defendant doctors, Joseph Cillo, Herbert Langer, and Ernest P. Greenberg, negligently failed to diagnose that his mother, Rosemary Procanik, had contracted German measles in the first trimester of her pregnancy. As a result, Peter was born with congenital rubella syndrome. Alleging that the doctors negligently deprived his parents of the choice of terminating the pregnancy, he seeks general damages for his pain and suffering and for "his parents' impaired capacity to cope with his problems." He also seeks special damages attributable to the extraordinary expenses he will incur for medical, nursing, and other health care. The Law Division granted defendants' motion to dismiss, and the Appellate Division affirmed in an unreported opinion.

We granted certification, 95 *N.J.* 176 (1983). We now conclude that an infant plaintiff may recover as special damages the extraordinary medical expenses attributable to his afflic-

tion, but that he may not recover general damages for emotional distress or for an impaired childhood. Consequently, we affirm in part and reverse in part the judgment of the Appellate Division, and remand the matter to the Law Division.

## I

Because this matter comes before us on the grant of a motion to dismiss, we focus on the complaint, which contains three counts. In the first count, Peter, through his guardian *ad litem*, seeks damages for birth defects and impaired childhood; in the second count, his parents seek damages for emotional distress and extraordinary medical expenses attributable to Peter's defects; and in the third count, his parents assert a claim for malpractice against their former attorneys. Accepting as true the plaintiff's allegations, *see, e.g., Portee v. Jaffee,* 84 *N.J.* 88, 90 (1980), the complaint discloses the following facts.

The defendant doctors, Joseph Cillo, Herbert Langer, and Ernest P. Greenberg, are board-certified obstetricians and gynecologists who apparently conduct a group practice. On June 9, 1977, during the first trimester of her pregnancy with Peter, Mrs. Procanik consulted the defendant doctors and informed Dr. Cillo "that she had recently been diagnosed as having measles but did not know if it was German measles." Dr. Cillo examined Mrs. Procanik and ordered "tests for German Measles, known as Rubella Titer Test." The results "were 'indicative of past infection of Rubella.'" Instead of ordering further tests, Dr. Cillo negligently interpreted the results and told Mrs. Procanik that she "had nothing to worry about because she had become immune to German Measles as a child." In fact, the "past infection" disclosed by the tests was the German measles that had prompted Mrs. Procanik to consult the defendant doctors.

Ignorant of what an accurate diagnosis would have disclosed, Mrs. Procanik allowed her pregnancy to continue, and Peter

was born on December 26, 1977. Shortly thereafter, on January 16, 1978, he was diagnosed as suffering from congenital rubella syndrome. As a result of the doctors' negligence, Mr. and Mrs. Procanik were deprived of the choice of terminating the pregnancy, and Peter was "born with multiple birth defects," including eye lesions, heart disease, and auditory defects. The infant plaintiff states further that "he has suffered because of his parents' impaired capacity to cope with his problems," and seeks damages for his pain and suffering and for his "impaired childhood."

In April 1983, while this matter was pending in the Appellate Division, Peter moved to amend the first count to assert a claim to recover, as special damages, the expenses he will incur as an adult for medical, nursing, and related health care services. In its opinion, the Appellate Division denied without prejudice leave to amend. Although this claim was not raised before the trial court and not considered by the Appellate Division, fairness, justice, and judicial efficiency persuade us to consider the claim for special damages.

The complaint, which was filed on April 8, 1981, contains two other counts. In the second count, Peter's parents seek damages for their emotional distress and for the extraordinary medical expenses attributable to Peter's birth defects. Before the trial court they stipulated, however, that they knew they had a potential cause of action by January 1978, nearly three years before instituting suit. The trial court ruled, therefore, that the parents' claim was barred by the two-year statute of limitations contained in *N.J.S.A.* 2A:14–2. Before us, however, the parents contend that their claim is derived from Peter's claim and that *N.J.S.A.* 2A:14–2.1, which tolls the statute of limitations during infancy, protects their claim. Hence, the parents ask us to recognize their claim.

In the third count, the parents assert a claim for malpractice against their former attorneys, alleging that they consulted defendant attorney Harold A. Sherman, who undertook to ad-

vise them of their legal rights. Mr. Sherman consulted with defendant attorneys Greenstone, Greenstone & Naishuler, a professional corporation specializing in medical malpractice claims. After conferring with Mr. Goldsmith of that firm, Mr. Sherman advised the parents on May 2, 1979 that they did not have a cause of action, and he never informed them that this Court had granted certification in *Berman v. Allan* on September 5, 1978.

In *Berman*, 80 *N.J.* 421,which was decided on June 26, 1979, we recognized that parents may recover for emotional distress for the "wrongful birth" of a child born with birth defects. The defendant attorneys, however, never advised Mr. and Mrs. Procanik that they had a cause of action, and the two-year statute of limitations ran on their claim on January 16, 1980. The trial court did not rule on the attorney malpractice claim, and that issue is not before us.

II

In this case we survey again the changing landscape of family torts. *See Schroeder v. Perkel*, 87 *N.J.* 53, 71 (1981). Originally that landscape presented a bleak prospect both to children born with birth defects and to their parents. If a doctor negligently diagnosed or treated a pregnant woman who was suffering from a condition that might cause her to give birth to a defective child, neither the parents nor the child could maintain a cause of action against the negligent doctor. *Gleitman v. Cosgrove*, 49 *N.J.* 22 (1967).

Like the present case, *Gleitman* involved a doctor who negligently treated a pregnant woman who had contracted German measles in the first trimester of her pregnancy. Reasoning from the premise that the doctor did not cause the infant plaintiff's birth defects, the *Gleitman* Court found it impossible to compare the infant's condition if the defendant doctor had not been negligent with the infant's impaired condition as a result of the negligence. Measurement of "the value of life

with impairments against the nonexistence of life itself" was, the Court declared, a logical impossibility. *Id.* at 28. Consequently, the Court rejected the infant's claim.

The Court denied the parents' claim for emotional distress and the costs of caring for the infant, because of the impossibility of weighing the intangible benefits of parenthood against the emotional and monetary injuries sustained by them. Prevailing policy considerations, which included a reluctance to acknowledge the availability of abortions and the mother's right to choose to terminate her pregnancy, prevented the Court from awarding damages to a woman for not having an abortion. Another consideration was the Court's belief that "[i]t is basic to the human condition to seek life and hold on to it however heavily burdened." 49 *N.J.* at 30.

In the seventeen years that have elapsed since the *Gleitman* decision, both this Court and the United States Supreme Court have reappraised, albeit in different contexts, the rights of pregnant women and their children. The United States Supreme Court has recognized that women have a constitutional right to choose to terminate a pregnancy. *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973). Recognition of that right by the high court subsequently influenced this Court in *Berman v. Allan, supra*, 80 *N.J.* 421.

In *Berman*, the parents sought to recover for their emotional distress and for the expenses of raising a child born with Down's Syndrome. Relying on *Roe v. Wade, supra*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147, the Court found that public policy now supports the right of a woman to choose to terminate a pregnancy. *Berman v. Allan, supra*, 80 *N.J.* at 431–32. That finding eliminated one of the supports for the *Gleitman* decision—*i.e.*, that public policy prohibited an award for depriving a woman of the right to choose whether to have an abortion. Finding that a trier of fact could place a dollar value on the parents' emotional suffering, the *Berman* Court concluded "that the monetary equivalent of this distress is an appropri-

ate measure of the harm suffered by the parents." 80 *N.J.* at 433.

Nonetheless, the Court rejected the parents' claim for "medical and other expenses that will be incurred in order to properly raise, educate and supervise the child." *Id.* at 432. The Court reasoned that the parents wanted to retain "all the benefits inhering in the birth of the child—*i.e.*, the love and joy they will experience as parents—while saddling defendants with enormous expenses attendant upon her rearing." *Id.* Such an award would be disproportionate to the negligence of the defendants and constitute a windfall to the parents. *Id.*

The *Berman* Court also declined to recognize a cause of action in an infant born with birth defects. Writing for the Court, Justice Pashman reasoned that even a life with serious defects is more valuable than non-existence, the alternative for the infant plaintiff if his mother chose to have an abortion. *Id.* at 429.

More recently we advanced the parents' right to compensation by permitting recovery of the extraordinary expenses of raising a child born with cystic fibrosis, including medical, hospital, and pharmaceutical expenses. *Schroeder v. Perkel, supra*, 87 *N.J.* at 68–69. No claim on behalf of the infant was raised in that case, *id.* at 61, and we elected to defer consideration of such a claim until another day. *Id.* at 66. That day is now upon us, and we must reconsider the right of an infant in a "wrongful life" claim to recover general damages for diminished childhood and pain and suffering, as well as special damages for medical care and the like.

### III

The terms "wrongful birth" and "wrongful life" are but shorthand phrases that describe the causes of action of parents and children when negligent medical treatment deprives parents of the option to terminate a pregnancy to avoid the birth of a defective child. *See Schroeder v. Perkel, supra*,

87 *N.J.* at 75–76 (Handler, J., concurring and dissenting). In the present context, "wrongful life" refers to a cause of action brought by or on behalf of a defective child who claims that but for the defendant doctor's negligent advice to or treatment of its parents, the child would not have been born. "Wrongful birth" applies to the cause of action of parents who claim that the negligent advice or treatment deprived them of the choice of avoiding conception or, as here, of terminating the pregnancy. *See* Comment, " 'Wrongful Life': The Right Not To Be Born," 54 *Tul.L.Rev.* 480, 484–85 (1980); A. Capron, "Tort Liability in Genetic Counseling," 79 *Colum.L.Rev.* 618, 630–57 (1979).

■ Both causes of action are distinguishable from the situation where negligent injury to a fetus causes an otherwise normal child to be born in an impaired condition. *See, e.g., Smith v. Brennan,* 31 *N.J.* 353 (1960); *W. Prosser, Law of Torts* § 55 at 335–38 (4th ed. 1971). In the present case, the plaintiffs do not allege that the negligence of the defendant doctors caused the congenital rubella syndrome from which the infant plaintiff suffers. Neither do plaintiffs claim that the infant ever had a chance to be a normal child. The essence of the infant's claim is that the defendant doctors wrongfully deprived his mother of information that would have prevented his birth.

Analysis of the infant's cause of action begins with the determination whether the defendant doctors owed a duty to him. The defendant doctors do not deny they owed a duty to the infant plaintiff, and we find such a duty exists. *See Berman v. Allan, supra,* 80 *N.J.* at 444 (Handler, J., concurring and dissenting); *Gleitman v. Cosgrove, supra,* 49 *N.J.* at 50 (Jacobs, J., dissenting). In evaluating the infant's cause of action, we assume, furthermore, that the defendant doctors were negligent in treating the mother. Moreover, we assume that their negligence deprived the parents of the choice of

terminating the pregnancy and of preventing the birth of the infant plaintiff.

Notwithstanding recognition of the existence of a duty and its breach, policy considerations have led this Court in the past to decline to recognize any cause of action in an infant for his wrongful life. The threshold problem has been the assertion by infant plaintiffs not that they should not have been born without defects, but that they should not have been born at all. *Gleitman v. Cosgrove, supra,* 49 *N.J.* at 28. The essence of the infant's cause of action is that its very life is wrongful. *Berman v. Allan, supra,* 80 *N.J.* at 427. Resting on the belief that life, no matter how burdened, is preferable to non-existence, the *Berman* Court stated that the infant "has not suffered any damage cognizable at law by being brought into existence." *Id.* at 429. Although the premise for this part of the *Berman* decision was the absence of cognizable damages, the Court continued to be troubled, as it was in *Gleitman,* by the problem of ascertaining the measure of damages. *Id.* at 428.

The courts of other jurisdictions have also struggled with the issues of injury and damages when faced with suits for wrongful life. Although two intermediate appellate courts in New York and California recognized an infant's claim for general damages, those decisions were rejected by the courts of last resort in both jurisdictions. In two decisions, *Becker v. Schwartz,* 60 *A.D.*2d 587, 400 *N.Y.S.*2d 119 (1977), and *Park v. Chessin,* 60 *A.D.*2d 80, 400 *N.Y.S.*2d 110 (1977), the Appellate Division of the New York Supreme Court held that a claim for wrongful life stated a valid cause of action. The Court of Appeals reversed, reasoning that an infant does not have a right to be born as a whole functioning human being and that it is beyond judicial competence to ascertain whether the infant has suffered any injury by being born. *Becker v. Schwartz,* 46 *N.Y.*2d 401, 411, 413 *N.Y.S.*2d 895, 900, 386 *N.E.*2d 807, 812 (1978). Similarly, the California Supreme Court overruled a Court of Appeal's holding that an infant plaintiff could recover

general damages for wrongful life. *Turpin v. Sortini*, 31 *Cal.* 3d 220, 643 *P.*2d 954, 182 *Cal.Rptr.* 337 (1982) (overruling in part *Curlender v. Bio-Science Laboratories*, 106 *Cal.App.*3d 811, 165 *Cal.Rptr.* 477 (1980)).

Other courts have uniformly found that the problems posed by the damage issues in wrongful life claims are insurmountable and have refused to allow the action on behalf of the infant. *See, e.g., Gildiner v.. Thomas Jefferson Univ. Hosp.*, 451 *F.Supp.* 692, 694 (E.D.Pa.1978) (applying Pennsylvania law); *Moores v. Lucas*, 405 *So.*2d 1022, 1025 (Fla.Dist.Ct.App.1981); *Eisbrenner v. Stanley*, 106 *Mich.App.* 357, 308 *N.W.*2d 209, 211–13 (Ct.App.1981); *Speck v. Finegold*, 497 *Pa.* 77, 439 *A.*2d 110 (1981) (evenly divided court affirming 268 *Pa.Super.* 342, 408 *A.*2d 496, 508 (1979)); *Dumer v. St. Michael's Hosp.*, 69 *Wis.*2d 766, 233 *N.W.*2d 372, 375–76 (1975).

Even when this Court declined to recognize a cause of action for wrongful life in *Gleitman* and *Berman*, dissenting members urged recognition of that claim. Justice Jacobs wrote in *Gleitman* that a wrong has been committed and that the law "can afford some reasonable measure of compensation towards alleviating the financial burdens." 49 *N.J.* at 49. He described the claim for emotional distress as "incalculable," but found "the medical and maintenance expenses causally related to the abnormality" to be "readily measurable." *Id.* at 50. Although the *Berman* Court found the determination of damages to be "humanly impossible," it recognized the possibility that, if the measure of damages were the only concern, "some judicial remedy could be fashioned which would redress plaintiff, if only in part, for injuries suffered." 80 *N.J.* at 428. While recognizing "the measurement of damages for nonphysical injury is at best elusive and complex," *id.* at 437, Justice Handler has espoused recognition of an infant's claim in his separate opinions in *Schroeder v. Perkel, supra*, 87 *N.J.* at 72, and *Berman v. Allan, supra*, 80 *N.J.* at 434. Extending through these opinions is an awareness that damages would be appropriate if they were measurable by acceptable standards.

Recently we recognized that extraordinary medical expenses incurred by parents on behalf of a birth-defective child were predictable, certain, and recoverable. *Schroeder v. Perkel, supra,* 87 *N.J.* at 68–69. In reaching that conclusion, we discussed the interdependence of the interests of parents and children in a family tort:

> The foreseeability of injury to members of a family other than one immediately injured by the wrongdoing of another must be viewed in light of the legal relationships among family members. A family is woven of the fibers of life; if one strand is damaged, the whole structure may suffer. The filaments of family life, although individually spun, create a web of interconnected legal interests. This Court has recognized that a wrongdoer who causes a direct injury to one member of the family may indirectly damage another. [*Id.* at 63–64.]

When a child requires extraordinary medical care, the financial impact is felt not just by the parents, but also by the injured child. As a practical matter, the impact may extend beyond the injured child to his brothers or sisters. Money that is spent for the health care of one child is not available for the clothes, food, or college education of another child.

Recovery of the cost of extraordinary medical expenses by either the parents or the infant, but not both, is consistent with the principle that the doctor's negligence vitally affects the entire family. *Gleitman, supra,* 49 *N.J.* at 50 (Jacobs, J., dissenting). As Justice Jacobs stated in *Gleitman:*

> And while logical objection may be advanced to the child's standing and injury, logic is not the determinative factor and should not be permitted to obscure that he has to bear the frightful weight of his abnormality throughout life, and that such compensation as is received from the defendants or either of them should be dedicated primarily to his care and the lessening of his difficulties. Indeed, if this were suitably provided for in the ultimate judgment, the technical presence or absence of the child as an additional party plaintiff would have little significance. [*Id.*]

■ Law is more than an exercise in logic, and logical analysis, although essential to a system of ordered justice, should not become a instrument of injustice. Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to

the injustice of that result. The right to recover the often crushing burden of extraordinary expenses visited by an act of medical malpractice should not depend on the "wholly fortuituous circumstance of whether the parents are available to sue." *Turpin v. Sortini, supra,* 31 *Cal.*3d at 328, 643 *P.*2d at 965, 182 *Cal.Rptr.* at 348.

█ The present case proves the point. Here, the parents' claim is barred by the statute of limitations. Does this mean that Peter must forego medical treatment for his blindness, deafness, and retardation? We think not. His claim for the medical expenses attributable to his birth defects is reasonably certain, readily calculable, and of a kind daily determined by judges and juries. We hold that a child or his parents may recover special damages for extraordinary medical expenses incurred during infancy, and that the infant may recover those expenses during his majority.

Our decision is consistent with recent decisions of the Supreme Courts of California and Washington. The Supreme Court of California has held that special damages related to the infant's birth defects may be recovered in a wrongful life suit. *Turpin v. Sortini, supra,* 31 *Cal.*3d at 238, 643 *P.*2d at 965, 182 *Cal.Rptr.* at 348. Following *Turpin,* the Supreme Court of Washington has held that either the parents or the child may recover special damages for medical and other extraordinary expenses incurred during the infant's minority, and that the child may recover for those costs to be incurred during majority. *Harbeson v. Parke-Davis,* 98 *Wash.*2d 460, 656 *P.*2d 483 (1983).

In restricting the infant's claim to one for special damages, we recognize that our colleagues, Justice Schreiber and Justice Handler, disagree with us and with each other. From the premise that "man does not know whether non-life would have been preferable to an impaired life," at 369, Justice Schreiber concludes that a child does not have a cause of action for wrongful life and, therefore, that it is "unfair and unjust to

charge the doctors with the infant's medical expenses." At 370. Justice Handler reaches a diametrically opposite conclusion. He would allow the infant to recover not only his medical expenses, but also general damages for his pain and suffering and for his impaired childhood.

We find, however, that the infant's claim for pain and suffering and for a diminished childhood presents insurmountable problems. The philosophical problem of finding that such a defective life is worth less than no life at all has perplexed not only Justice Schreiber, but such other distinguished members of this Court as Chief Justice Weintraub, *Gleitman, supra,* 49 *N.J.* at 63 (Weintraub, C.J., dissenting in part), Justice Proctor, *Gleitman, supra,* 49 *N.J.* at 30, and Justice Pashman, *Berman v. Allan, supra,* 80 *N.J.* at 429. We need not become preoccupied, however, with these metaphysical considerations. Our decision to allow the recovery of extraordinary medical expenses is not premised on the concept that non-life is preferable to an impaired life, but is predicated on the needs of the living. We seek only to respond to the call of the living for help in bearing the burden of their affliction.

■ Sound reasons exist not to recognize a claim for general damages. Our analysis begins with the unfortunate fact that the infant plaintiff never had a chance of being born as a normal, healthy child. Tragically, his only choice was a life burdened with his handicaps or no life at all. The congenital rubella syndrome that plagues him was not caused by the negligence of the defendant doctors; the only proximate result of their negligence was the child's birth.

The crux of the problem is that there is no rational way to measure non-existence or to compare non-existence with the pain and suffering of his impaired existence. Whatever theoretical appeal one might find in recognizing a claim for pain and suffering is outweighed by the essentially irrational and unpredictable nature of that claim. Although damages in a personal

injury action need not be calculated with mathematical precision, they require at their base some modicum of rationality.

Underlying our conclusion is an evaluation of the capability of the judicial system, often proceeding in these cases through trial by jury, to appraise such a claim. Also at work is an appraisal of the role of tort law in compensating injured parties, involving as that role does, not only reason, but also fairness, predictability, and even deterrence of future wrongful acts. In brief, the ultimate decision is a policy choice summoning the most sensitive and careful judgment.

From that perspective it is simply too speculative to permit an infant plaintiff to recover for emotional distress attendant on birth defects when that plaintiff claims he would be better off if he had not been born. Such a claim would stir the passions of jurors about the nature and value of life, the fear of non-existence, and about abortion. That mix is more than the judicial system can digest. We believe that the interests of fairness and justice are better served through more predictably measured damages—the cost of the extraordinary medical expenses necessitated by the infant plaintiff's handicaps. Damages so measured are not subject to the same wild swings as a claim for pain and suffering and will carry a sufficient sting to deter future acts of medical malpractice.

As speculative and uncertain as is a comparison of the value of an impaired life with non-existence, even more problematic is the evaluation of a claim for diminished childhood. The essential proof in such a claim is that the doctor's negligence deprives the parents of the knowledge of the condition of the fetus. The deprivation of that information precludes the choice of terminating the pregnancy by abortion and leaves the parents unprepared for the birth of a defective child, a birth that causes them emotional harm. The argument proceeds that the parents are less able to love and care for the child, who thereby suffers an impaired childhood. *Schroeder v. Perkel, supra,* 87 *N.J.* at 72 (Handler, J., concurring and dissenting); *Berman v.*

*Allan, supra,* 80 *N.J.* at 434 (Handler, J., concurring and dissenting).

Several considerations lead us to decline to recognize a cause of action for impaired childhood. At the outset, we note the flaw in such a claim in those instances in which the parents assert not that the information would have prepared them for the birth of the defective child, but that they would have used the information to prevent that birth. Furthermore, even its advocates recognize that a claim for "the kind of injury suffered by the child in this context may not be readily divisible from that suffered by her wronged parents." *Berman v. Allan, supra,* 80 *N.J.* at 445 (Handler, J., concurring and dissenting). We believe the award of the cost of the extraordinary medical care to the child or the parents, when combined with the right of the parents to assert a claim for their own emotional distress, comes closer to filling the dual objectives of a tort system: the compensation of injured parties and the deterrence of future wrongful conduct.

The final issue is whether the time-barred claim of Mr. and Mrs. Procanik may be revived as a claim that derives from the infant's timely action. At one time Mr. and Mrs. Procanik had independent claims for their emotional distress, *Berman v. Allan, supra,* 80 *N.J.* 421 and for the extraordinary medical expenses arising from Peter's multiple birth defects. *Schroeder v. Perkel, supra,* 87 *N.J.* 53.

The trial court ruled that the parents' claims were barred by the two-year period of limitations contained in *N.J. S.A.* 2A:14–2. Although the parents recognize that their claim, if viewed as independent, is time-barred, they contend that the claim should be viewed as derivative from the infant's claim and, therefore, that it should not have been dismissed. In making that contention, they rely on *N.J.S.A.* 2A:14–2.1, which pertains to a parent who "has a claim for damages suffered by him because of an injury to a minor child caused by the wrongful act, neglect or default of any person * * *." A

parent in such a case may commence an action "within the same period of time as provided" for the commencement of the minor's action. Just three years ago, however, in *Schroeder v. Perkel, supra,* 87 *N.J.* 53, we declared that the parents' claim was independent from that of the child's. The defect in the parents' argument in the present case is that their right to recover is not "because of injury" to their child, but because of direct injury to their own independent rights. Consequently, the parents' right to recover is not derivative from the claim of the child and is, therefore, barred by *N.J.S.A.* 2A:14–2.

Our decision today recognizes Peter's right to recover the extraordinary expenses necessitated by his birth defects and also recognizes that the parents, even if they had instituted a timely action, could not recover a second time for those expenses. Finally, Peter's right to recover the costs of his health care is separate from his parent's claim for their own pain and suffering, and recognition of Peter's right to recover does not resuscitate the expired independent claim of the parents.

The judgment of the Appellate Division is affirmed in part, reversed in part, and the matter is remanded to the Law Division. The infant plaintiff shall have leave to file an amended complaint asserting a claim for extraordinary medical, hospital, and other health care expenses.

HANDLER, J., concurring in part and dissenting in part.

This is the third occasion in a relatively short span of time that the Court has struggled with defining the scope of the tort of "wrongful life." In *Berman v. Allen,* 80 *N.J.* 421 (1979), we recognized such a cause of action on behalf of the infant's parents, and that the mental and emotional anguish of the parents attributable to their deprivation of a meaningful choice concerning the birth of their child and the infant's tragic congenital condition is an appropriate measure of damages for the parents. These rulings overruled *Gleitman v. Cosgrove,* 49 *N.J.* 22 (1967). We also held in *Berman* that the infant, who

was born afflicted with Down's Syndrome, did not suffer any damages cognizable at law. I dissented from the rulings of the Court that limited the parents' measure of recoverable damages and that, further, denied a cause of action for the child. 80 *N.J.* at 434.

In *Schroeder v. Perkel*, 87 *N.J.* 53 (1981), the Court extended its *Berman* ruling by allowing the parents to recover extraordinary medical expenses of raising the afflicted child, *i.e.*, those expenses needed for the child's survival. This was in addition to damages for mental and emotional suffering. However, the Court continued to refuse to recognize any cause of action on behalf of the child. *Id.* at 65. Again, I dissented. *Id.* at 72.

In *Berman* and *Schroeder*, the infant plaintiff had not presented an express claim based on an independent cause of action attributable to defendant doctors' malpractice. Nevertheless, I believed that such a claim was inevitably implicated in the basic cause of action brought by the parents and therefore merited our attention. In the present case, however, such a claim is expressly made; its determination is inescapable. The Court now expressly rejects any claim that a cognizable tort has been committed on the infant. Its foreshadowed hostility to the infant's cause of action has, unfortunately, hardened into an explicit holding.

Despite the Court's extension in this case of damages on behalf of the parents and its decision to commit the damages recovery to the infant, my differences with the Court deepen on whether a cognizable tort has been inflicted against the infant plaintiff. I am firmly convinced that we should recognize a cause of action on behalf of the afflicted child with a full and fair measure of damages that adequately encompasses the enormity of the wrong. I adhere to the view previously expressed in both *Berman* and *Schroeder*. There, I urged the Court to consider the feasibility of damages to the afflicted child in the form of an "impaired childhood." Recognition of this condition, a corollary of impaired parental capacity, would

serve to assure a direct recovery for the unfortunate infant, wholly apart from any damages flowing to the parents, which may or may not be preserved for the benefit of the child.

The Court posits as the only basis for permitting a recovery on behalf of the infant the preference of nonlife over life. This is a self-created hypothesis. The Court professes a lack of competence to deal with this dilemma, denying the infant's cause of action. I do not think it right, however, to deny damages to the afflicted child because we are confounded by the complexities of comparing existence with nonexistence. We have dealt with this intractable conundrum in other settings. In human affairs persons sometimes are driven to this ultimate, awesome choice. However, the Court itself need not express a preference of life over nonlife but only understand that individuals in necessitous situations have the right to make that choice. We should acknowledge, therefore, that in determining whether the afflicted infant has a cause of action for wrongful life, the Court is neither compelled nor asked to assume a Hamlet role. We should recognize that the wrongful deprivation of the individual choice either to bear or to not bear a handicapped child is a tort—to the infant as well as the parents—and embark upon the important task of defining the infant's damages.

I

I think it is realistic, feasible, and fair to permit an afflicted infant born in these circumstances damages that would include the element of an impaired childhood. I expressed this in *Berman:*

> An adequate comprehension of the infant's claims under these circumstances starts with the realization that the infant has come into this world and is here, encumbered by an injury attributable to the malpractice of the doctors. That injury does not consist of the child's afflicted condition; her affliction was not the doctor's doing. Rather, the injury consists of a diminished childhood in being born of parents kept ignorant of her defective state while unborn and who, on that account, were less fit to accept and assume their parental responsibilities. The frightful weight of the child's natural handicap has been

made more burdensome by defendants' negligence because her parents' capacity has been impaired; they are less able to cope with the extra-heavy parental obligations uniquely involved in providing a child so afflicted with the unfaltering love, constant devotion and extraordinary care such a child specially requires. [80 *N.J.* at 442.]

The majority in this case deprecates the nature of this injury to the infant child, as well as its compensability. *Ante* at 354–355. Its position reflects a reluctance, perhaps understandable, to deal with the subtle but terrible realities of the psychological, mental, and emotional damage that ensue from the birth of a congenitally defective child in these circumstances. I accept the subtlety and elusiveness of these human conditions but I do not for a moment concede that injury in this form "presents insurmountable problems in fashioning relief." *Id.* at 353.

The essence of the injury of a diminished childhood is that it can be a mirror reflection of the diminished ability of the parents to care for their child. This does not involve only, or even, a lack of love, as suggested by the majority. In truth, parental love in this tragic scene may be blocked by overwhelming dark emotions, as the sun's light can be eclipsed by the moon. The psychological trauma is much deeper and the impairment more pernicious than a seeming lack of love. As the authorities have come to recognize, the parental condition is characterized not by diminished love for the child. Rather, such parents "are consumed with an awful sorrow. Not the surgical sorrow of death, but an hourly, daily, yearly sorrow— an agonizing, shattering, tearing sorrow." *G. Stigen, Heartaches and Handicaps* 6 (1976).

The parents of handicapped children can have a distinctive reaction, which has been described as a lifelong " 'chronic sorrow,' a pervading feeling of psychological grief." Challela, "Helping Parents Cope with a Profoundly Mentally Retarded Child," in *Coping with Crises and Handicap* 210 (A. Milunsky ed. 1981) (citing Olshansky, "Chronic Sorrow: A Response to Having a Mentally Defective Child," 42 *Soc. Casework* 190

(1962)). Such parents may harbor negative feelings of disbelief, fear, anger, inferiority or rejection that are difficult to express. They may fear being unable to handle their children's handicaps and that the child may be a burden, especially to a normal sibling. Fairfield, "Parents Coping with Genetically Handicapped Children: Use of Early Recollections," 49 *Exceptional Children* 411, 413, 415 (Feb.1983). Some parents may be weighted with guilt at their desire to escape the hardship of coping with the child; others experience a sense of genetic failure as a family unit. *Id.* at 413, 414.

Parents can suffer diminished parental capacity as a result of these conditions. Most significantly their impairment as parents can be related to their being excluded from perhaps the most important decision in their lives—whether to give birth to a congenitally defective child. They may construe this exclusion as a personal failure that is the "cause" of their child's suffering and a major factor in contributing to his or her burdens. Lavelle & Keogh, "Expectations and Attributions of Parents of Handicapped Children," *New Directions for Exceptional Children: Parents and Families of Handicapped Children* 4 (J. Gallagher ed. 1980) [hereinafter cited as Lavelle & Keogh, *New Directions*]. Thus, parents victimized by negligent genetic counselling bear a multiple burden. Not only must they deal with the unanticipated shock of discovering that their child is handicapped, but also they must cope with the belief that but for their failure to decide their child's fate they might have spared the child a life of affliction.

Parental reactions in the wake of the birth of a congenitally defective child in these circumstances can be the most critical factor in terms of capacity to function as parents. Research indicates that individual differences in parental perceptions of their infants, as much as individual differences in the infants themselves, can affect the parental attachment and family adaptation process. Lavelle & Keogh, *New Directions, supra,* at 3. Parental adaptation can be the critical, determinative variable in the adjustment of severely handicapped children

regardless of the level of physical impairment of the child. *R. Darling, Families Against Society: A Study of Reactions to Children with Birth Defects* 41 (1979).

> The birth of a child has an effect on family life, frequently eliciting both positive and negative feelings. If the child is born with a defect, negative feelings predominate and family disintegration may be involved. * * * Emphasis is placed upon reactions to the birth of a child, for it is assumed that many of these initial reactions continue for long periods of time and are transmitted to the child.
>
> [Clifford & Brantley, "When I Was Born: Perceived Parental Reactions of Adolescents," 41 *J. Personality Assessment* 604 (Dec.1977)(citations omitted).]

Thus, it cannot be overemphasized that the malpractice involved in genetic counselling can have a demonstrable adverse impact on the afflicted child. I stated in *Berman* that the breach of the defendant's duty can have extraordinary consequences for the child as well as the parents and the wrong done "in truth and reality * * * vitally affects * * * [the] entire immediate family," 80 *N.J.* at 444, quoting *Gleitman v. Cosgrove, supra,* 49 *N.J.* at 50 (Jacobs, J., dissenting).

Genetic counselling malpractice should not be regarded as a remote or tenuous factor in the blighted life of the afflicted child. The depth and duration of parents' negative emotions can be affected by such counselling. Counselling consists not only of the content of the advice given but also the manner in which it is related. The timing and the attitude of those who inform parents that their children are handicapped or congenitally defective can be crucial in the consequent ability of such patients to adjust and cope as parents. Although the situation during which awareness first arises and notice or information as to the child's condition as initially imparted is always climactic for parents, a delayed, misleading, or mishandled diagnosis exacerbates parental trauma. *R. Darling, Families Against Society, supra,* at 138.

The emotional trauma associated with a delayed, confusing or mishandled communication of diagnosis is particularly relevant in this case, in that the parents' fears that their unborn child

would suffer rubella syndrome had initially been assuaged by defendant's negligent genetic counselling. The parents were led to believe prior to birth that their child was healthy and normal, only to discover at birth that the very fears they had laid to rest as a result of defendants' alleged malpractice had now materialized. Thus, the "delayed" diagnosis they received was likely to result in greater shock and disbelief. This perception of "novelty shock," to which I referred in *Berman*, underlies the injury of diminished parenthood.

> This, I believe, is the crux of the wrong done in this case. Through the failure of the doctors to advise an expectant mother, and father, of the likelihood or certainty of the birth of a mongoloid child, the parents were given no opportunity to cushion the blow, mute the hurt, or prepare themselves as parents for the birth of their seriously impaired child. Their injury is real and palpable. [80 *N.J.* at 439.]

As mentioned, not only the timing of diagnosis but also the manner of the counselling can influence parental adjustment.

> The reaction of mothers to first information concerning their child's condition appears to be closely related to the perceived interest and concern of the professionals who contact the mother. For example, Roskies (1972) noted that, while physicians were usually the first professionals to notify a mother that her child was handicapped, an atmosphere of anxiety, uncertainty, and confusion tended to permeate the announcement.
>
>     \*    \*    \*    \*    \*    \*    \*    \*
>
> There is some evidence that parents' views of the professional's role relative to their handicapped child are related to parents' attributions about the professional's motives. Roskies (1972) found that many mothers felt that the physician's main concern was to protect himself or to mitigate the mothers' feelings of guilt.
>
> [Lavelle & Keogh, *New Directions, supra,* at 14–15.]

It is reasonable to conclude that when a physician, who has inaccurately and negligently genetically counselled parents, at some later time, conveys the information to parents that their child is abnormal, that physician may likely create an atmosphere infused with deep-seated negative emotion. As a result, the parents' ability to cope can be diminished.

> Mothers who felt that the physician had been abrupt or had failed to give adequate information were liable to have bizarre ideas of their infants (D'Arcy, 1968). In contrast, Emde and Brown (1976) found that an empathic response on the part of professionals lessened the parents' grief and facilitated their

adaptation to the reality of the condition. \* ˣ \* The mother's perception of society's view of her child can, in turn, influence her feelings about her capacity to love and to care for the child. [*Id.* at 15–16.]

This Court quite clearly accepts the proposition that parents who have experienced a profound wrong through negligent genetic-counselling undergo mental and emotional suffering. Both common experience and the insight of experts strongly show that that kind of anguish can involve "diminished parental capacity," *Berman, supra*, 80 *N.J.* at 440, a dysfunctional state that is the predicate of "impaired childhood." The debilitating and anguished condition of impaired parenthood can arise not only because of the parents' loss of personal autonomy and self-determination in being excluded from any meaningful choice in deciding the fate of their afflicted child. It may also be caused or worsened by the delayed knowledge of their child's condition and the manner in which this knowledge was conveyed to them.

In sum, the resultant adverse consequences to the parents— the mental and emotional suffering—are now acknowledged by the Court and accepted as an element in its award of damages. Experience teaches us that persons suffering in this way may be significantly impaired in their capacity as parents. Consequently, the adverse impact to the child in the form of a diminished childhood is equally real and undeniable. I am, thus, disheartened by this Court's refusal to permit plaintiffs in an appropriate case—and this case is assuredly that—to develop through competent evidence the diminished childhood of the infant plaintiff as an element of compensable damages.

## II

I would also invite the Court to consider both the soundness and fairness of more general damages on behalf of the afflicted child. The majority awards extraordinary medical expenses as an element of damages of the parents, which it then transfers to the infant child. It makes a point of stressing that its damages award "is not premised on the concept that non-life is

preferable to an impaired life * * *." *Ante* at 353. The Court in effect rejects any claim of the infant for pain and suffering or for a diminished childhood because these theories of injury would, in the Court's view, require acceptance of the proposition that nonexistence must be preferred over existence. *Id.* at 353–354. The Court appears to assume that to justify any award of damages to the infant, the infant's injury must be defined as having been born with birth defects, with any resultant damages necessitating a preference of nonlife to life itself. *Ante* at 354.

I do not agree with this premise. The infant plaintiff's injury need not be defined as being born defective or require that nonexistence be preferred to existence. Rather, his injury consists of the consequences of the deprivation of his parents' right to determine on his behalf whether he should have been born. What then is at issue as the basis for a cause of action is *not* the postulate that nonlife is preferable to life. Rather, the issue is whether parents—for themselves and their child as a family—were deprived of the opportunity to make the fateful decision and enact their preference of one over the other.

This Court has recognized that an individual may in certain circumstances have the right to make a decision that favors nonexistence over existence. The Court, it is to be emphasized, can recognize that individual right without itself expressing a preference. There is a right of personal autonomy and self-determination with respect to an individual's control of his or her own body and destiny. This can implicate the fundamental choice of life itself. In some situations, the Court has accepted the substituted judgment of a surrogate, guardian or family as the only means of preserving the right of personal choice or self-determination on the part of an individual otherwise unable to exercise that right. Some people may be helpless or incompetent and devoid of the means to express their will on matters concerning their own care, including survival. This does not mean, however, that they lack a right of individual autonomy that involves personal choice and self-determination. When the

right exists but the ability or will to exercise it does not, courts will struggle to find a way to effectuate that right. *In re Quinlan,* 70 *N.J.* 10, 41–42 *cert.* denied *sub. nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976); *In re Conroy,* 188 *N.J.Super.* 523 (Ch.Div.), rev'd on other grounds, 190 *N.J.Super.* 453 (App.Div.1983), certif. granted, 95 *N.J.* 195 (1984); *see also In re Grady,* 85 *N.J.* 235 (1981).

By analogy, in the context of this case the "child's complaint is predicated on the failure of the doctor to provide his parents with the ability to make informed choices on his behalf. Substituting the parents' judgment for that of the child provides a practicable way to recognize the injury to the child." Note, "A Preference for Nonexistence: Wrongful Life and a Proposed Tort of Genetic Malpractice," 55 *S.Cal.L.Rev.* 477, 492 (1982). A court or jury, in cases such as these, is not called on to make its *own* judgment or to be guided by its *own* subjective moral values as to whether the child should have been born. The metaphysical dilemma of comparing existence with nonexistence is not presented and does not have to be resolved in determining whether a familial tort has been committed. That tort is the preemption of expectant parents from any choice as to their child's fate. "The right of *parents* to decide whether they should bear a particular child is at stake, not judicial recognition that a certain life is worth living. * * * " Note, *supra,* 55 *S.Cal.L.Rev.,* at 490, 492. *See also* Capron, "Tort Liability in Genetic Counseling," 79 *Colum.L.Rev.* 618, 660 (1979) ("[W]hen a physician or other genetic counselor wrongfully fails to disclose information about genetic risks material to a couple's decision to bear a child, he or she has breached a duty owed both to the couple and to the prospective child."). One of the consequences of that tort is that the child may be forced to live out the counter-decision of his parents, with all of its severe burdens.

Clearly then what confronts the Court is not divining a standard by which one can know whether nonexistence is to be preferred over existence. It is, rather, identifying the damages

that flow from the denial of parental choice. The Court in *Schroeder v. Perkel, supra,* 87 *N.J.* at 63–64 accepted the premise that the parents' deprivation of choice constitutes a familial tort and can affect their child.

> The foreseeability of injury to members of a family other than one immediately injured by the wrongdoing of another must be viewed in light of the legal relationships among family members. A family is woven of the fibers of life; if one strand is damaged, the whole structure may suffer. The filaments of family life, although individually spun, create a web of interconnected legal interests. This Court has recognized that a wrongdoer who causes a direct injury to one member of the family may indirectly damage another.

*See Berman, supra,* 80 *N.J.* at 445–46 (Handler, J., concurring in part and dissenting in part). The majority recognizes, in this case, that the suffering of pain and sorrow in these circumstances is not a singular or individualized injury; it permeates the whole family. Presumably, the shared impact of the family tort is the basis for the Court's extending the recovery of the cost of extraordinary medical expenses to either the parents or the infant, since all parties, possibly including siblings, suffer the resulting financial strain. *Ante* at 351.

I respectfully suggest therefore that no "insurmountable problems," *ante* at 353, thwart the formulation of fair redress for the infant himself. To reiterate, the Court itself need not engage in the prospect of valuing life but only recognize that this is an individual right, the wrongful loss of which justifies redress.

### III

The proposition that nonexistence can be chosen over existence, though philosophically remarkable, is not judicially indefensible or unprecedented. An *individual* —as distinct from the court—has the right to determine that "a defective life is worth less than no life at all," *ante* at 353. To vindicate this right, courts have been called upon to balance the quality of the existence of a hopelessly ill person against that of nonexistence in determining whether to allow a guardian or surrogate the choice to terminate life-sustaining medical procedures. *In re*

*Quinlan, supra,* 70 *N.J.* 10. The burdens of continuing life can in some circumstances outweigh any supposed or presumed benefits that life may continue to offer. *In re Conroy, supra,* 188 *N.J.Super.* at 527–28.

Contrary to the premise that life is always more precious in any form than death, this Court has permitted action that would accelerate the termination of life in particular cases. *In re Quinlan, supra,* 70 *N.J.* at 41; *see In re Conroy, supra,* 188 *N.J.Super.* 523. Other courts have also come to recognize the legitimacy and validity of individual choice to prefer nonexistence in extraordinary circumstances. *E.g., In re Guardianship of Barry,* 445 *So.*2d 365 (Fla.Dist.Ct.App.1984) (natural parents of ten month old terminally ill child in permanent vegetative coma can refuse or order discontinued his life support system); *In re Osborne,* 294 *A.*2d 372 (D.C.1972) (dying patients can refuse treatment on religious grounds); *Eichner v. Dillon,* 73 *A.D.*2d 431, 426 *N.Y.S.*2d 517 (N.Y.App.Div.1980), modified, 52 *N.Y.*2d 363, 438 *N.Y.S.*2d 266, 420 *N.E.*2d 64 (1981) (guardian can discontinue life support for patient in a chronic vegetative state to carry out patient's prior expressed wish); *Satz v. Perlmutter,* 362 *So.*2d 160 (Fla.Dist.Ct.App.1978), aff'd, 379 *So.*2d 359 (Fla.1980) (mentally competent, terminally ill patient can exercise right of self-determination by electing to remove respirator, even if inevitable result is his own death); *In re Estate of Brooks,* 32 *Ill.*2d 361, 205 *N.E.*2d 435 (1965) (dying patients can refuse treatment on religious grounds); *Superintendent of Belchertown v. Saikewicz,* 373 *Mass.* 728, 370 *N.E.*2d 417 (1977) (hospital can withhold painful treatment from terminally ill, mentally incompetent patient); *In re Dinnerstein,* 6 Mass.App. 466, 380 *N.E.*2d 134 (1978) (doctors can withhold resuscitation of terminally ill mental incompetent).

In vindicating this individual right, the Court does not arrogate to itself the individual's choice. Rather, it allows the individual's guardian or surrogate to make that choice, recognizing not only the legitimacy of a personal right to opt for nonexistence, but also the necessity of protecting that choice in

order to preserve a basic right of personal autonomy and self-determination. We should, therefore, acknowledge in this case that individuals may lawfully determine in a necessitous or exigent setting that nonlife may reasonably be preferred over life. If we accept that premise—as we must, encompassing as it does both a fundamental personal right and, frequently, the best interests of the individual—then we ought to conclude that damages flow from the deprivation of this right and that the infant plaintiff should be reasonably compensated.

Concededly, the difficulties in formulating standards to assess damages for an infant plaintiff who asserts wrongful life, claiming he was denied the choice of nonexistence over an impaired life, are manifold. Though such a measurement is unquestionably difficult, "to deny * * * redress for * * * injuries merely because damages cannot be measured with precise exactitude would constitute a perversion of fundamental principles of justice." *Berman, supra,* 80 *N.J.* at 433; *see also Nappe v. Anschelewitz,* 97 *N.J.* 37, 41 n. 1 (1984).

Although the infant plaintiff's injury consists of the deprivation of his parents' choice of whether to bring him into an afflicted existence, his damages need not be assessed by expressing a preference of nonexistence over existence. There are alternative standards that may be used feasibly in appropriate cases. One such approach can be a balancing test, comparing the severity of the child's defects against the benefits of his life; when the burden outweighs the benefits, the difference between the burden of life with defects and the benefits of that impaired existence can be the measure of damages. *See In re Quinlan, supra,* 70 *N.J.* 10; *In re Conroy, supra,* 188 *N.J.Super.* 523; Note, *supra,* 55 *S.Cal.L.Rev.,* at 502, citing Comment, "'Wrongful Life': The Right Not to be Born," 54 *Tul.L.Rev.* 480, 498 (1980). Another alternative can permit a recovery involving a consideration of the quality of life for the child, had the infant's parents not suffered a diminished parenthood with the resultant diminished childhood visited on the infant. Capron, 79 *Colum.L.Rev., supra,* at 654. Further, in appropriate

circumstances, diminished or impaired childhood can also constitute an element of damages.  *Supra* at 345–351.

In sum, we should recognize that the gravamen of the familial tort is the denial of parental choice with respect to their infant's life.  That tort unquestionably impacts on the infant.  Recognition of the tort and the reality of the damages that ensue does not require that the court itself in any case determine that nonlife is to be preferred over life, but only that the individuals involved were denied self-determination and their right to exercise that preference.  I would leave to plaintiff the initial burden to marshall competent evidence to demonstrate the elements that should be weighed in assessing an award of damages.  I would not, as the Court does now, close the door to any direct relief on behalf of the afflicted infant.

For these reasons, I dissent in part from the judgment of the Court.

SCHREIBER, J., dissenting in part.

I join in substantially all of Justice Pollock's sensitive opinion concerning the infant's claim of general damages for wrongful life.  However, I cannot agree that the defendant doctors must pay the infant the costs of medical and other health-care expenses that were not incurred as a result of any breach of duty owed by the doctors to the infant.

The majority recognizes, *ante* at 353–55, as do I, that the child's wrongful life action for general damages is fundamentally flawed.  *See generally* Annot., "Tort liability for wrongfully causing one to be born," 83 *A.L.R.*3d 15 (1978) (overview of case law on wrongful life).  The bedrock for that conclusion is that man does not know whether nonlife would have been preferable to an impaired life.  As Chief Justice Weintraub so eloquently framed the issue:

> With respect to the claim advanced on behalf of the infant, I agree with the majority that it cannot be maintained.  Ultimately, the infant's complaint is that he would be better off not to have been born.  Man, who knows nothing of death or nothingness, cannot possibly know whether that is so.

> We must remember that the choice is not between being born with health or being born without it; it is not claimed the defendants failed to do something to prevent or reduce the ravages of rubella. Rather the choice is between a worldly existence and none at all. Implicit, beyond this claim against a physician for faulty advice, is the proposition that a pregnant woman who, duly informed, does not seek an abortion, and all who urge her to see the pregnancy through, are guilty of wrongful injury to the fetus, and indeed that every day in which the infant is sustained after birth is a day of wrong. To recognize a right not to be born is to enter an area in which no one could find his way. [*Gleitman v. Cosgrove*, 49 *N.J.* 22, 63 (1967) (Weintraub, C.J., dissenting in part).]

Once one acknowledges, as the majority has, *ante* at 353–55, that the child has no cause of action for general damages stemming from wrongful life, it is unfair and unjust to charge the doctors with the infant's medical expenses. The position that the child may recover special damages despite the failure of his underlying theory of wrongful life violates the moral code underlying our system of justice from which the fundamental principles of tort law are derived.

An essential element of negligence law is that the defendant's conduct must proximately cause the plaintiff's damages. Most significant is the fact here that the defendant doctors did not injure the child. The doctors did not cause or fail to do something to prevent the multiple birth defects. Yet the damages with which the doctors are being charged are the costs of the medical expenses necessitated by those birth defects.

It is, of course, proper for a court to inquire whether traditional common-law notions should continue to be followed. Therefore, it is appropriate to ask why the crucial component—causation—should not be eliminated in assessing special damages against these defendants. The reason for proximate cause is that it is fair to require a defendant to pay for the damages he causes, and it is generally unfair to charge a defendant for damages he does not cause.

There are two circumstances in which monetary awards unrelated to the plaintiff's injury may be justifiable. The first is when punishment is in order, that is, when the defendant should be punished civilly for wanton and willful misconduct to

the plaintiff. However, there is no allegation that the defendants' conduct approached that level and, indeed, the majority accepts the proposition that the defendants did not direct any improper conduct toward the infant plaintiff.

The second circumstance in which awarding such damages may be justified is when the award would help to deter doctors from negligently failing to advise parents of significant possible defects in their future children. How realistic is that contention? First, doctors carry malpractice insurance, and the costs seemingly imposed on the defendants will actually be borne by those members of the public using the services of obstetricians or whatever grouping of doctors occurs for insurance purposes. Second, under existing law, parents have a malpractice claim for the identical misconduct. *Schroeder v. Perkel*, 87 *N.J.* 53 (1981). Thus, the possible deterrent effect is already there.

Finally, some other forms of deterrence against malpractice now exist. The Legislature has acted to protect society from incompetent doctors by authorizing the State Board of Medical Examiners to suspend or revoke a doctor's license when it has been demonstrated that he is professionally incompetent to practice medicine. *N.J.S.A.* 45:9–16(i). Hospitals have also established their own standards of care, and may revoke the hospital privileges of doctors who fail to satisfy those standards, directly affecting the doctors' ability to practice medicine. *Cf. Greisman v. Newcomb Hosp.*, 40 *N.J.* 389 (1963) (hospital's discretionary power to grant admitting privileges to doctors must be exercised in the public interest).

On balance I do not believe the Court is justified in discarding the concept that defendants ordinarily pay as damages only those expenses that are incurred as a result of the defendants' action or inaction. To make the leap from negligence to non-causally-related damages is unwarranted in this case. I, too, am sensitive to the difficulties with which this family must grapple. However, sympathy for a handicapped child and his parents should not lead us to ignore the notions of responsibili-

ty, causation, and damage that underlie the entire philosophy of our system of justice. It would be unwise—and, what is more, unjust—to permit the plaintiff to recover damages from persons who caused him no injury. I cannot concur in such a result.

*For affirmance in part and for reversal in part*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN and GARIBALDI—5.

*Concurring in part; dissenting in part*—Justice HANDLER—1.

*Dissenting in part*—Justice SCHREIBER—1.